2005 WY 3

**In the Interest of SJJ and ERJ, II, minor children:**

**SLJ, Appellant (Respondent),**

v.

**The State of Wyoming, Department of Family Services, Albany County Field Office, Appellee (Petitioner).**

No. C–04–9.

Supreme Court of Wyoming.

Jan. 11, 2005.

Representing Appellant: Matthew F.G. Castano of Brown & Hiser, LLC, Laramie, Wyoming.

Representing Appellee: Patrick J. Crank, Attorney General; Robin Sessions Cooley, Deputy Attorney General; and Jill E. Kucera, Senior Assistant Attorney General. Argument by Ms. Kucera.

Representing Guardian ad Litem: Devon O'Connell Coleman of Pence & MacMillan, Laramie, Wyoming.

Before HILL, C.J., and GOLDEN, KITE, and VOIGT, JJ., and JAMES, D.J.

KITE, Justice.

[¶ 1] In 2001, the Department of Family Services (DFS) took SJJ and ERJ, II, ages seven and six, from the home of their paternal grandmother where they had been living since 1996 and placed them in protective custody. Just over a year later, DFS filed a petition for termination of parental rights against the mother, SLJ, and the father, ERJ. After a three day trial, the district court determined that SLJ's parental rights [1] should be terminated pursuant to Wyo. Stat. Ann. § 14–2–309(a)(i) (LexisNexis 2003), authorizing termination where a child has been left in the care of another without support or communication from the absent parent for at least a year, and Wyo. Stat. Ann. § 14–2–309(a)(v) (LexisNexis 2003), authorizing termination where a child has been in foster care for fifteen of the most recent twenty-two months and a showing that the parent is unfit. SLJ appeals the order terminating her parental rights. We affirm.

## ISSUES

[¶ 2] SLJ presents the following issues:

1. Whether the State of Wyoming put forth sufficient evidence to establish that SLJ's conduct violated Wyo. Stat. Ann.

§§ 14–2–309(a)(i) and (a)(v) by clear and convincing evidence.

2. Whether the State was required to show reasonable efforts by an authorized agency or mental health professional had been unsuccessful in rehabilitating the family or the family has refused rehabilitative treatment before terminating SLJ's parental rights.

3. Whether the district court erred when it allowed confidential records to be admitted into evidence.

DFS phrases the issues as:

I. Whether the district court properly found, by clear and convincing evidence, that appellant's parental rights to SJJ and ERJ, [II], should be terminated pursuant to Wyo. Stats. §§ 14–2–309(a)(i) and (v)?

II. Whether the district court properly admitted into evidence records from the juvenile proceedings?

The guardian ad litem presents the following issues:

I. Did the State of Wyoming present clear and convincing evidence to support the termination of appellant's parental rights?

II. Is the State of Wyoming required pursuant to Wyoming Statutes § 14–2–309(a)(i) or § 14–2–309(a)(iv) to show reasonable efforts to rehabilitate appellant?

III. Were records presented pursuant to the attendant juvenile action properly admitted into evidence?

## FACTS

[¶ 3] SLJ and ERJ are the biological parents of SJJ and ERJ, II. In October of 1996, when SJJ and ERJ, II were eighteen months and six months old respectively, SLJ asked the children's paternal grandmother, who resided in Laramie, Wyoming, to come to Arizona where she and the children were living, and take the children back to Laramie to live with her until SLJ could find employment and was able to care for them. ERJ was then serving time in an Arizona prison.

---

1. The district court also terminated the father's parental rights, however, he did not appeal that determination.

[¶4] In March of 1997, ERJ signed a document giving his mother, the children's paternal grandmother, temporary custody of the children. The following September, he filed a complaint for divorce in the district court, Albany County, Wyoming, where he was then residing after his release from prison in Arizona. In addition to a divorce from SLJ, he sought full custody of the children. SLJ was served with notice of the complaint by publication pursuant to W.R.C.P. 4(c), and she failed to respond. ERJ filed a motion for entry of default and, after a hearing, the district court entered a judgment and decree of divorce on February 23, 1998. ERJ was awarded full custody of the children and SLJ was ordered to pay child support. One month later, in March of 1998, paternal grandmother filed petitions for appointment of herself as guardian of the children along with forms executed by ERJ consenting to the guardianship.[2] The district court entered orders appointing paternal grandmother as temporary guardian.

[¶5] Meanwhile, SLJ filed motions to modify the divorce decree and rescind the custody order. The district court set the motions for hearing, notified SLJ of the hearing date and made arrangements for her to participate by telephone. SLJ failed to appear as arranged and the district court on June 17, 1998, entered a child custody and visitation order confirming the divorce and the custody award to ERJ. SLJ subsequently filed a motion for new trial based upon procedural errors,[3] which the district court granted, and on June 14, 2000, the district court entered a new decree granting the divorce and awarding custody of the children to paternal grandmother as guardian.

[¶6] From October of 1996 until August of 2001, the children remained in paternal grandmother's care in Wyoming while SLJ lived in Arizona. On June 15, 2000, as part of the divorce proceedings, ERJ and SLJ filed stipulations for the indefinite appointment of paternal grandmother as the children's guardian and the maternal grandparents as alternate guardians. In their stipulations, SLJ and ERJ each stated they were unable to care for the children and did not expect to be able to do so in the foreseeable future.

[¶7] In August of 2001, DFS received a report that paternal grandmother was abusing SJJ and ERJ, II. DFS investigated, and on August 14, 2001, moved for placement of the children in temporary protective custody. Following a hearing, the district court ordered the children be placed in protective custody. Once the children were in protective custody, the district court entered another order authorizing DFS to create a multidisciplinary team (MDT) to develop a case plan for the children. The district court set the matter for hearing in September of 2001 and provided notice to SLJ. SLJ responded with pro se motions to terminate paternal grandmother's appointment as guardian, to allow SLJ to appear at the hearing by telephone and to terminate ERJ's parental rights.

[¶8] The MDT met on October 21, 2001. SLJ was part of the MDT and participated in part of the meeting by telephone. The recommendation of the majority of the MDT members was for the children to remain in the custody of DFS with the goal of permanent placement with their maternal grandparents, the alternate guardians. The DFS child protection case manager assigned to the case testified that termination of parental rights was mentioned as a consideration at the MDT meeting. The DFS contact log concerning the case contains an entry stating the majority of the MDT members "agreed that [SLJ]'s parental rights should be terminated" and that SLJ dissented. On November 2, 2001, a majority of the MDT filed written recommendations with the district

---

**2.** ERJ was in and out of jail. Apparently, he was in jail at the time his mother filed the guardianship petitions.

**3.** The procedural errors giving rise to a new trial were: 1) failure to join paternal grandmother, the person having physical custody of the children, as required by Wyo. Stat. Ann. § 20–6–302;

2) failure to require the parties to file financial affidavits as required by Wyo. Stat. Ann. § 20–6–302; and 3) failure to impose a visitation schedule, provide which party will bear the transportation costs and impose a remedy in the event the parties disagree on the meaning of "reasonable" visitation.

court, recommending continued custody with DFS with eventual permanent placement with the maternal grandparents. A written summary included with the recommendations states that SLJ "withdrew her participation from the meeting" and would be sending a letter objecting to the MDT recommendations.

[¶ 9] On November 7, 2001, SLJ sent a letter to the district court objecting to the MDT's recommendations and suggesting that a home study be conducted cooperatively by DFS and the Arizona Department of Child Protection Services to determine her competency and fitness as a parent. "Upon the positive results of the home study," SLJ wrote, "[she] should be granted full legal and physical custody of her children."

[¶ 10] A review hearing was held on December 11, 2001. SLJ again appeared by telephone and asked for a home study to investigate her abilities to care for her children. At that time, SLJ informed the court she had not seen the children since January of 2000 nor had she paid any child support. On January 3, 2002, the district court entered a final disposition order finding that paternal grandmother pleaded nolo contendere to the allegations of abuse, removal of the children from her home was in their best interest, reasonable efforts had been made to prevent removal of the children from the home, and the children should be moved to the maternal grandparents' home. The district court also ordered DFS to conduct a home study of SLJ in Arizona.

[¶ 11] On March 19, 2002, the Arizona home study was completed. The study recommended that SLJ was not an appropriate placement resource for SJJ and ERJ, II. The district court held a review hearing on May 13, 2002, and SLJ appeared by telephone. At the commencement of the hearing, DFS informed the court that the Arizona home study recommended against placing the children in SLJ's home. DFS also informed the court and those participating in the hearing, including SLJ, that it was recommending termination of both parents' parental rights.

[¶ 12] On June 4, 2002, DFS mailed a copy of its May 2002 case plan to SLJ. The case plan informed SLJ that DFS would be pursuing termination of her parental rights with adoption as the ultimate goal for the children and placement in a therapeutic foster care home in the meantime. On July 2, 2002, the district court entered an order continuing custody of the children with DFS with placement at the maternal grandparents' home. The district court found in relevant part that the "home study showed that placement with the mother is not appropriate", "DFS recommends termination of parental rights for both biological mother and father", "a petition for termination of parental rights is appropriate as the father is in prison for a felony, not due for release until March 2003, and the mother has not had custody or control of the children for many years, has not provided support and has had irregular· and incidental contact." A copy of the order was sent to SLJ.

[¶ 13] By letter dated August 26, 2002, DFS notified SLJ that it intended to pursue termination of her parental rights and raised the question whether she would be willing to relinquish those rights. The letter informed SLJ that if she chose not to relinquish her parental rights, DFS would file a termination action within ten days. SLJ responded with a letter to the district court stating that she would not relinquish her parental rights and requesting the appointment of counsel.

[¶ 14] On October 21, 2002, DFS filed a petition for termination of parental rights against SLJ and ERJ. As grounds for termination of SLJ's parental rights, DFS alleged that, except for a one to two week period in 1997, SLJ did not physically visit or have anything more than incidental telephone contact with the children between 1996 and 2001 and contributed only $20 to the support of the children during that time.· DFS asked the district court to terminate SLJ's parental rights pursuant to § 14–2–309(a)(i) on the grounds that the children were left in the care of another without provision for support or communication from their mother for a period of at least a year. On December 19, 2002, DFS filed a motion to amend the petition for termination of parental rights to further allege that the children had been in the protective custody of DFS for fifteen of the last twenty-two months, SLJ was unfit to

have custody of the children and, pursuant to § 14–2–309(a)(v), her parental rights should be terminated.

[¶ 15] Following another review hearing and prior to trial on the termination petition, the district court on April 1, 2003, entered an order continuing custody of the children with DFS. At that time, the district court found in relevant part that "reasonable efforts have been made to reunify the family," "termination of parental rights and adoption of the children is the recommended goal in this case," "the home study in record shows that the mother of the minor children is not an appropriate placement option," and "the mother of the minor children has yet to appear before this Court at anytime during these proceedings."

[¶ 16] In preparation for trial on the termination petition, DFS filed a motion for an order requiring SLJ to undergo a mental examination for the purpose of assessing her parenting abilities. Over SLJ's objection, the district court entered an order requiring her to participate in a mental examination by a specified psychologist at a specified date and time. SLJ failed to appear for the examination and the district court entered another order requiring her to appear at a new date and time. SLJ again failed to appear.

[¶ 17] Trial on the termination petition was conducted October 13 through 15, 2003. The district court heard testimony from the paternal grandmother; ERJ's federal probation officer; SLJ's father; the children's therapist and therapeutic foster care coordinator; two therapeutic foster care case managers; SLJ's sister; the children's temporary and current foster mothers; a clinical psychologist retained by DFS to perform a psychological evaluation of the children; a DFS child protection case worker; and ERJ. The court did not hear testimony from SLJ because she did not appear in person or by telephone. On the morning of trial, counsel for SLJ made an oral motion to allow SLJ to appear by telephone. The district court denied the motion for two reasons:

Number one, it wasn't timely made; but perhaps more importantly is [SLJ] has been involved in a number of cases in this court, both juvenile and in this particular case, over a period of years. She has never appeared in this court. And this is one of those situations where, quite frankly, she needs to be here.

I note for the record that she didn't appear here either when she was ordered to appear in connection with some discovery examinations, and that was when the State offered to pay her way. She still didn't make it. So quite frankly, I don't think that economics has anything to do with the situation.

The district court allowed SLJ's counsel to cross-examine and present evidence such as he could without his client being present. At the close of the trial, the district court asked the parties to submit briefs if they wished on the issue of whether DFS was required under the circumstances of this case to attempt to reunify the family prior to seeking to terminate the parents' rights. From the record before us, it appears none of the parties submitted a brief.

[¶ 18] On November 10, 2003, the district court issued a twenty-one page decision letter in which it concluded preliminarily that DFS had no "statutory obligation to demonstrate that rehabilitation and reunification attempts were unsuccessful when pursuing an action for termination of parental rights under W.S. §§§ 14–2–309(a)(i), (a)(iv) and (a)(v)." The district court further concluded DFS demonstrated by clear and convincing evidence that SLJ's parental rights should be terminated pursuant to § 14–2–309(a)(i) and (a)(v). On February 12, 2004, consistent with its decision letter, the district court entered an order terminating SLJ's parental rights.

### STANDARD OF REVIEW

[¶ 19] We review decisions terminating parental rights pursuant to the following standards:

Due to the tension between the fundamental liberty of familial association and the compelling state interest in protecting the welfare of children, application of statutes for termination of parental rights is a matter for strict scrutiny. As part of this strict scrutiny standard, a case for termination of parental rights must be estab-

lished by clear and convincing evidence. Clear and convincing evidence is that kind of proof that would persuade a trier of fact that the truth of the contention is highly probable. Rigorous though this standard may be, we apply our traditional principles of evidentiary review when a party challenges the sufficiency of the evidence supporting termination. Thus, we examine the evidence in the light most favorable to the party prevailing below, assuming all favorable evidence to be true while discounting conflicting evidence presented by the unsuccessful party.

*MN v. Dept. of Family Services*, 2003 WY 135, ¶ 5, 78 P.3d 232, ¶ 5 (Wyo.2003) (citations omitted).

[¶ 20] Resolution of the issues SLJ presents also requires application of our standards for interpreting statutory language:

[W]e look first to the plain and ordinary meaning of the words to determine if the statute is ambiguous. A statute is clear and unambiguous if its wording is such that reasonable persons are able to agree on its meaning with consistency and predictability. Conversely, a statute is ambiguous if it is found to be vague or uncertain and subject to varying interpretations. Ultimately, whether a statute is ambiguous is a matter of law to be determined by the court.

When a statute is sufficiently clear and unambiguous, we give effect to the plain and ordinary meaning of the words and do not resort to the rules of statutory construction. Instead, our inquiry revolves around the ordinary and obvious meaning of the words employed according to their arrangement and connection. In doing so, we view the statute as a whole in order to ascertain its intent and general purpose and also the meaning of each part. We give effect to every word, clause and sentence and construe all components of a statute in pari materia.

We endeavor to interpret statutes in accordance with the legislature's intent. When examining a statute, we presume that the legislature enacts legislation with full knowledge of existing law and with reference to other statutes and decisions of the courts. Such legislation should, therefore, be construed in a way that creates a consistency and harmony within the existing law.

*Yeager v. Forbes*, 2003 WY 134, ¶ 13, 78 P.3d 241, ¶ 13 (Wyo.2003) (citations omitted).

## DISCUSSION

### *Sufficiency of the Evidence*

[¶ 21] In her first issue, SLJ claims clear and convincing evidence was not presented to support the district court's order terminating her parental rights on the basis of § 14–2–309(a)(i) *and* § 14–2–309(a)(v). That is, she claims the evidence was not sufficient to show that she left her children in another's care without communication or support for at least one year, as provided in § 14–2–309(a)(i), *and* the children were under the care of DFS for fifteen of the most recent twenty-two months and she was unfit to have custody, as provided in § 14–2–309(a)(v). These subsections of § 14–2–309 of the Termination of Parental Rights Act (Wyo. Stat. Ann. §§ 14–2–308 through 14–2–319 (LexisNexis 2003)), which the district court relied upon in terminating her rights, provide as follows:

(a) The parent-child legal relationship may be terminated if any one (1) or more of the following facts is established by clear and convincing evidence:

(i) The child has been left in the care of another person without provision for the child's support and without communication from the absent parent for a period of at least one (1) year. In making the above determination, the court may disregard occasional contributions, or incidental contacts and communications;

. . .

(v) The child has been in foster care under the responsibility of the state of Wyoming for fifteen (15) of the most recent twenty-two (22) months, and a showing that the parent is unfit to have custody and control of the child;

[¶ 22] In responding to the issue as phrased by SLJ, we note first that § 14–2–

309(a) does not require clear and convincing proof of both (a)(i) *and* (a)(v) as SLJ's statement of the issue suggests. Rather, the provision by its express terms requires clear and convincing evidence of "any one (1) or more" of the stated facts. Thus, to support the district court's ruling, the record must contain clear and convincing evidence that SLJ left her children in the care of another without communication or provision of support for a year or more, *or* that the children were under the care of DFS for at least a year and SLJ was unfit.

[¶ 23] With this clarification in mind, we turn to SLJ's argument, the focus of which is § 14–2–309(a)(i). She does not contest, nor did she ever contest, the fact that the children were under the care of DFS for fifteen of the most recent twenty-two months as provided in subsection (a)(v). She also presents no argument in her brief pertaining to her fitness as a parent, the second showing required under subsection (a)(v). Because she limits her argument to (a)(i), and because we find clear and convincing evidence supporting the termination on the basis of that one factor, which is all that § 14–2–309(a)(i) requires, we do not address the sufficiency of the evidence to support termination under (a)(v).[4]

[¶ 24] Addressing the sufficiency of the evidence under § 14–2–309(a)(i), SLJ asserts the district court relied for its decision that termination was warranted primarily on the testimony of the children's paternal grandmother who, by her own admission, was unable to recall events clearly and had difficulty remembering dates and details of SLJ's contact with the children. Given that fundamental rights were at stake, SLJ contends the district court should have given greater consideration to her father's more reliable testimony.

[¶ 25] DFS responds that the grandmother's difficulty remembering some dates does not negate the remainder of her testimony, which was to the effect that SLJ rarely contacted the children. DFS asserts that the maternal grandfather's testimony did not help SLJ's case because he merely confirmed that her contact with the children was sporadic and limited. DFS cites the rule that the trial court is in the best position to assess witness credibility and weigh the testimony. Giving the district court the proper deference, DFS contends, its determination was supported by sufficient evidence. We find sufficient evidence in the record to uphold the district court's ruling.

[¶ 26] The paternal grandmother testified that the children lived with her for five years. They came to live with her initially because SLJ did not have a job or a place to stay and asked if the children could stay with her until SLJ had a job and was able to take care of them. The paternal grandmother agreed, drove to Arizona, picked up the children and brought them back to Laramie, Wyoming to live with her.

[¶ 27] The paternal grandmother testified that during the first year the children lived with her SLJ called them perhaps two or three times. She testified that during the entire five years the children lived with her, SLJ visited them only once for approximately forty-five minutes.[5] She also testified SLJ asked her to bring the children to Arizona to visit her only one time in the five years they lived with her in Wyoming. On that occasion, SLJ asked her to bring the children to a park to meet her, and when she and the children showed up, she was confronted by law enforcement officials who said SLJ told

---

4. We note, however, that as of December 19, 2002, the date DFS filed its amended complaint alleging (a)(v) as additional grounds for termination, the children had been in the care of DFS for sixteen of the most recent twenty-two months. Additionally, the Arizona home study concluded SLJ was not an appropriate placement for the children.

5. The forty-five minute visit with SJJ and ERJ, II was incidental to a trip SLJ made to Wyoming to contest a guardianship proceeding filed by her parents in district court in Torrington, Wyoming. In that action, SLJ's parents sought appointment as guardians for SLJ's other three children born from an earlier marriage. At the time SLJ's parents filed the guardianship petition in 2001, the three children had lived with them and been under their full custody and control since 1999. The district court granted the petition, SLJ's parents were appointed guardian of the three children and they have lived with their grandparents ever since.

them she had taken the children and would not give them back. She ended up leaving the children in Arizona with their mother and returning to Wyoming. Two weeks later, SLJ called and asked paternal grandmother to come back to Arizona, get the children and take them back to live with her. According to paternal grandmother, SLJ provided no monetary support for the children during the five years they lived with her.

[¶ 28] SLJ's father, the children's maternal grandfather, testified the children lived with him for six months in late 2001 and early 2002. He testified that during that time, SLJ contacted the children maybe three or four times. He characterized her contact with the children as "very intermittent, sporadic."

[¶ 29] We find the district court's conclusion that SLJ had very limited, sporadic contact with the children from 1996 until 2001 was supported by sufficient evidence. From the record before us, we have no difficulty concluding the evidence was sufficient to persuade the fact finder as to the truth of DFS's contention that the children were left in their grandmother's care for over a year without provision for support and without more than incidental communication from SLJ. Examining the evidence in the light most favorable to DFS, assuming that evidence to be true and discounting conflicting evidence presented by SLJ, we hold sufficient evidence was presented to support the district court's ruling.

### *Reasonable Efforts to Rehabilitate*

[¶ 30] SLJ asserts her parental rights were improperly terminated because the state failed to show that reasonable efforts to rehabilitate her were unsuccessful. She cites Wyo. Stat. Ann. § 14-3-204(a)(iv) (LexisNexis 2003) of the Child Protection Services statutes, which requires DFS to investigate alleged child abuse or neglect, and where the investigation discloses abuse or neglect, initiate services with the family to help resolve the problem. She also cites Wyo. Stat. Ann. § 14-3-440 (LexisNexis 2003) of the Child Protection Act, which requires, with specified exceptions, reasonable efforts to preserve the family before placing

a child outside the home in a neglect proceeding. She argues that these provisions required DFS to make reasonable efforts to rehabilitate and reunify her family prior to attempting to terminate her parental rights.

[¶ 31] DFS contends § 14-2-309(a)(i) and (a)(v) do not require reasonable efforts to rehabilitate the parent or reunite the family prior to termination of parental rights. DFS contends the only factor under § 14-2-309(a) that requires efforts to rehabilitate is subsection (a)(iii), which concerns termination of parental rights where a child has been abused or neglected by the parent. Because that was not the provision the district court relied on for terminating SLJ's rights, DFS argues, the rehabilitation requirement found in subsection (a)(iii) does not apply. Addressing SLJ's argument under § 14-3-440, DFS asserts the provision does not apply because this case did not involve a DFS placement "outside the home." At the time the state became involved, DFS argues, the children were already placed "outside the home" because years earlier SLJ voluntarily turned them over to the care of their paternal grandmother and then formalized that arrangement in her divorce action by stipulating to the paternal grandmother having full custody and an indefinite guardianship.

[¶ 32] We hold that DFS was not required under the circumstances of this case to make reasonable efforts to reunify the family prior to terminating SLJ's parental rights. Section 14-2-309 sets forth seven facts supporting termination of parental rights. Proof of any one of those facts by clear and convincing evidence supports the termination of parental rights. Only one of those seven facts requires reasonable efforts to rehabilitate the family prior to terminating parental rights. Section § 14-2-309(a)(iii) provides:

(a) The parent-child legal relationship may be terminated if any one (1) or more of the following facts is established by clear and convincing evidence:

(iii) The child has been abused or neglected by the parent and **reasonable efforts by an authorized agency or mental health professional have been**

**unsuccessful in rehabilitating the family** or the family has refused rehabilitative treatment, and it is shown that the child's health and safety would be seriously jeopardized by remaining with or returning to the parent.

The remaining six subsections of § 14–2–309(a) do not require DFS to make rehabilitation efforts. Giving the plain language of the provision its ordinary meaning, only subsection (a)(iii) addressing abuse and neglect by a parent requires reasonable efforts to rehabilitate the family. DFS did not file termination proceedings on the basis of abuse or neglect by a parent nor did the district court enter its order on that basis. Rather, DFS filed termination proceedings, and the district court granted the petition, on the basis that the children were left in the care of another for at least a year under subsection (a)(i) and had been in foster care with the state for over fifteen of the last twenty-months and the parents were unfit under subsection (a)(v). Neither of these subsections requires reasonable efforts to rehabilitate the family.

[¶ 33] We turn to consideration of § 14–3–440, the other provision that SLJ relies upon to support her claim that DFS was required to make reasonable efforts to reunify the family. Section 14–3–440, currently the last provision of the Child Protection Act, provides in pertinent part as follows:

(a) Except as provided in W.S. 14–2–309(b) or (c), reasonable efforts shall be made to preserve and reunify the family:

(i) Prior to placement of the child outside the home, to prevent or eliminate the need for removing the child from the child's home; and

(ii) To make it possible for the child to safely return to the child's home.

(b) In determining what reasonable efforts shall be made with respect to a child and in making those reasonable efforts, the child's health and safety shall be the paramount concern.

(c) Reasonable efforts to place a child for adoption or with a legal guardian may be made concurrently with the reasonable efforts described in subsection (a) of this section.

(d) If continuation of reasonable efforts described in subsection (a) of this section is determined to be inconsistent with the permanency plan for the child, reasonable efforts shall be made for placement of the child in a timely manner in accordance with the permanency plan, and to complete the steps necessary to finalize the permanent placement of the child.

. . .

(f) The court shall make the reasonable efforts determinations required under this section at every court hearing. The reasonable efforts determinations shall be documented in the court's orders.

(g) If the court determines as provided in W.S. 14–2–309(a)(vi), (b) or (c) that reasonable efforts to preserve and reunify the family are not required:

(i) A permanency hearing as described in W.S. 14–3–431(c) shall be held for the child within thirty (30) days after the determination; and

(ii) Reasonable efforts shall be made to place the child in a timely manner in accordance with the permanency plan, and to complete whatever steps are necessary to finalize the permanent placement of the child.

(h) A petition to terminate parental rights shall be filed within sixty (60) days of a judicial determination that reasonable efforts to reunify the child and parent are not required pursuant to W.S. 14–2–309(a)(vi), (b) or (c).

[¶ 34] We find this section inapplicable to the termination of parental rights proceeding at issue here. Section 14–3–440 is part of the Child Protection Act (Wyo. Stat. Ann. §§ 14–3–401 through 14–3–440 (LexisNexis 2003)). Although the two enactments are in some cases closely intertwined, the Child Protection Act and the termination of parental rights statutes (§§ 14–2–308 through 14–2–319) are separate statutory enactments. The Child Protection Act applies to proceedings concerning a minor alleged to be neglected. Contained within the act are the procedures the legislature has determined must be followed upon an allegation that a

person has neglected a child in his custody. The Act allows a neglected child to be taken into custody and placed in shelter care while the neglect allegation is investigated and a determination is made as to the truth of the allegation. If it is determined that a child was neglected, the Act then provides procedures for making proper disposition of the child. Among the requirements of the Act is that, in neglect proceedings, reasonable efforts shall be made to preserve and reunify the family before a child is placed outside the home.

[¶ 35] Here, the neglect proceeding was filed against the custodian, the paternal grandmother. In the neglect proceeding against the paternal grandmother DFS was required to make reasonable efforts to reunify the family prior to placing the children outside the home. The neglect proceeding, however, is not before us—paternal grandmother did not appeal from the juvenile court neglect determination claiming that DFS failed to make reasonable efforts to reunify the family in accordance with § 14–3–440. Instead, what is before us is the termination action filed against SLJ pursuant to § 14–2–309. Section 14–2–309 does not require a showing of reasonable efforts to reunify the family prior to terminating parental rights. While subsection (a)(iii) does require a showing of reasonable efforts to rehabilitate the family prior to termination on the basis of abuse or neglect, there is no such requirement where termination is sought on the grounds stated in subsections (a)(i), (ii) and (iv) through (vii). SLJ's parental rights were terminated pursuant to § 14–2–309(a)(i) and (v) and DFS was not required to show reasonable efforts to reunify the family.

### Juvenile Records

 [¶ 36] SLJ claims the district court erred in allowing introduction of evidence in the form of witness testimony and documents from the juvenile court neglect proceeding. In support of her claim that such records were confidential and improperly used as evidence in the termination proceeding, she cites Wyo. Stat. Ann. § 14–3–214 (LexisNex-

is 2003) of the Child Protection Act, which provides in pertinent part as follows:

(a) All records concerning reports and investigations of child abuse or neglect are confidential except as provided by W.S. 14–3–201 through 14–3–215.

(b) Applications for access to records concerning child abuse or neglect contained in the state agency or local child protective agency shall be made in the manner and form prescribed by the state agency. Upon appropriate application, the state agency shall give access to any of the following persons or agencies for purposes directly related with the administration of W.S. 14–3–201 through 14–3–215.

[¶ 37] DFS responds that the district court did not err in allowing use of the juvenile court records in the termination proceedings. DFS asserts that use of such records is entirely proper and in accord with the Child Protection Services statutes' purpose of protecting the best interests of the child. DFS also claims SLJ stipulated to the use of the records and for that reason cannot now claim error in their introduction at trial.

[¶ 38] We hold that use of the juvenile court records in the termination proceedings was entirely appropriate. Section 14–3–214(b)(vi) authorizes the use of records concerning child abuse or neglect investigations by courts upon a showing that access to the records is necessary for determination of an issue. The juvenile court records concerning the children in this case were directly related to the termination of parental rights proceeding and were necessary for determining the issue of whether parental rights should be terminated. The two proceedings were closely entwined.

[¶ 39] Affirmed.