2007 WY 23

**In the Matter of the Parental Rights to A.D., D.D., and K.D., Minor Children,**

**C.L., Appellant (Respondent),**

v.

**Wyoming Department of Family Services, Appellee (Petitioner).**

**No. C–06–4.**

Supreme Court of Wyoming.

Feb. 9, 2007.

Representing Appellant: Cole N. Sherard, Wheatland, Wyoming.

Representing Appellee: Patrick J. Crank, Attorney General; Robin Sessions Cooley, Deputy Attorney General. Argument by Ms. Cooley.

Guardian Ad Litem: Eric E. Jones, Wheatland, Wyoming.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.

KITE, Justice.

[¶ 1]   CL (Mother) appeals from the district court's order granting the Wyoming Department of Family Service's (DFS) petition to terminate her parental rights. The district court concluded there was clear and convincing evidence to terminate Mother's

parental rights under Wyo. Stat. Ann. § 14–2–309(a)(iii) and (v) (LexisNexis 2005). Applying our deferential standard for reviewing the evidence while still recognizing the fundamental right to associate with family, we conclude there was sufficient evidence to support the district court's order terminating Mother's parental rights. Consequently, we affirm.

## ISSUES

[¶ 2]   Mother poses the following issues on appeal:

A.   Did the District Court err in finding clear and convincing evidence to terminate the parental rights of the Appellant under Wyo. Stat. Ann. § 14–2–30[9](a)(iii) (Lexis-Nexis 2006) because the child(ren) have been abused or neglected and reasonable efforts by an authorized agency have been unsuccessful in rehabilitating the family and it was shown that the child(ren)'s health and safety would be seriously jeopardized by remaining with or returning to the parent?

B.   Did the District Court err in finding clear and convincing evidence to terminate the parental rights of the appellant under Wyo. Stat. Ann. § 14–2–30[9](a)(v) (Lexis-Nexis 2005) because the child(ren) had been in foster care under the responsibility of the State of Wyoming for fifteen (15) of the most recent twenty-two (22) months and a showing that the parent is unfit to have custody and control of the child(ren)?

DFS phrases the appellate issue as:

Whether the district court's decision that appellant's parental rights to the minor children should be terminated was established by clear and convincing evidence?

## FACTS

[¶ 3]   Mother and CD (Father) are the biological parents of DD, KD and AD. DFS has been involved with this family since the oldest child was an infant. In January 2003, DFS removed the children from the parents' home based upon allegations of physical abuse by Father and neglect because of the filthy and unsafe condition of the home.

Mother and Father admitted the allegations of neglect, and the district court adjudicated the children to be neglected. The children were returned to the custody of the biological parents for a trial home placement in July of 2003. The reunification attempt ended when DFS again removed the children from the family home in September 2003, naming new allegations of physical abuse and neglect. The children have been in DFS' care and custody since that time.

[¶ 4]   The parents were generally uncooperative with DFS, and Mother was openly hostile toward the DFS caseworker. The parents did not consistently maintain employment, support the children, or have a suitable home. Father was imprisoned after the children were removed from the home the second time and DFS attempted to work with Mother so she could be reunified with the children. She continued, however, to fail to comply with DFS requirements. Citing a lack of progress in reunifying the family, DFS filed a petition to terminate Mother's and Father's parental rights on July 21, 2004.

[¶ 5]   The district court held a hearing on the termination petition in the spring of 2005.[1] The evidence offered at the hearing showed Mother had recently begun to make some efforts to lead a more responsible life. Before the hearing, she had found a suitable home and employment. At the conclusion of the hearing, the district court terminated Father's parental rights, but ruled that DFS had not proven, by clear and convincing evidence, the children's health and safety would be seriously jeopardized by returning them to Mother's custody or that she was unfit to have custody of the children. Pursuant to Wyo. Stat. Ann. § 14–2–316 (LexisNexis 2005),[2] the district court continued the hearing for six months and ordered DFS to retain custody of the children but make additional efforts to rehabilitate Mother. In its oral ruling, the district court told Mother she had "one more chance" to meet the requirements to be reunified with her children and ordered her to cooperate fully with DFS in order to accomplish that.

[¶ 6]   On June 22, 2005, DFS and Mother agreed to a case plan. Many of the elements of the case plan had been outlined in the district court's order continuing the hearing and in prior case plans. The June 2005 case plan included the following objectives and tasks, which we paraphrase:

1.   Mother would achieve emotional stability, good mental health and a healthy parent-child bond with her children. In order to achieve this objective, Mother agreed to continue individual therapy once per week, attend family therapy with the children once per week, and complete a parenting class.

2.   Mother would provide for her children. Her tasks to complete this objective included maintaining full-time employment, providing insurance for herself and the children, and complying with her child support obligations.

3.   Mother would have a stable, safe and appropriate home environment. In order to accomplish this objective, Mother was required to maintain a home for the children, with no other family members present, and to keep the home in an acceptable condition with no household pets.

4.   Mother would live a drug and alcohol free lifestyle. She was directed to submit to random urinary analysis tests in order to gauge her compliance with this objective.

5.   In the fifth objective, Mother agreed to weekly visitations with the children, as well as "telephone visits as arranged." The case plan indicated the visits were

---

1.  The delay in bringing this matter to hearing was the result of continuances granted at the request of both DFS and Mother.

2.  Section 14–2–316 states:
    If the court does not terminate the parent-child legal relationship, it shall dismiss the petition or direct an authorized agency to continue to make efforts to rehabilitate the parent and continue the hearing for no longer than six

(6) months. The authorized agency shall provide the court with any additional reports regarding its rehabilitative efforts and results. Pending final hearing, the court may continue the present placement of the child or place the child in the temporary custody of an authorized agency and fix responsibility for temporary child support.

initially intended to be supervised and then would "go to unsupervised as recommended by therapists."

The other objectives of the plan pertained to the children's day-to-day educational activities and healthcare and were not within Mother's control.

[¶ 7] On November 1, 2005, the district court held another hearing to consider DFS' termination petition. The evidence at the second hearing established Mother performed many of the tasks outlined in the case plan. However, she had lived in three different residences and changed jobs once during the six months between the hearings. The children's therapist, the family therapist, and the DFS caseworker opined Mother had not yet demonstrated a sufficiently stable lifestyle to allow them to recommend the family be reunified. Citing the length of time the children had been in foster care and the need for permanency in their lives, the district court terminated Mother's parental rights to DD, AD and KD. Mother filed a timely appeal with this Court.

## STANDARD OF REVIEW

[¶ 8] Mother challenges the sufficiency of the evidence to support the district court's termination decision.

[W]e apply our traditional principles of evidentiary review when a party challenges the sufficiency of the evidence supporting termination. Thus, we examine the evidence in the light most favorable to the party prevailing below, assuming all favorable evidence to be true while discounting conflicting evidence presented by the unsuccessful party.

*SLB v. JEO (In the Interest of ANO)*, 2006 WY 74, ¶ 7, 136 P.3d 797, 799–800 (Wyo. 2006), quoting *SLJ v. Dep't of Family Servs.*, 2005 WY 3, ¶ 19, 104 P.3d 74, 79–80 (Wyo. 2005).

## DISCUSSION

[¶ 9] Because the right to associate with one's family is fundamental, courts must strictly scrutinize petitions to terminate a parent's rights to his or her children. *SLB*, ¶ 7, 136 P.3d at 799–800; *TF v. Dep't of*

*Family Servs.*, 2005 WY 118, ¶ 15, 120 P.3d 992, 1000 (Wyo.2005). Thus, a case for termination of parental rights must be established by clear and convincing evidence. *SLJ*, ¶ 19, 104 P.3d at 79–80. " 'Clear and convincing evidence is that kind of proof that would persuade a trier of fact that the truth of the contention is highly probable.' " *Id.*, quoting *MN v. Dep't of Family Servs.*, 2003 WY 135, ¶ 5, 78 P.3d 232, 234 (Wyo.2003).

[¶ 10] In this case, the district court found clear and convincing evidence to terminate Mother's parental rights pursuant to two separate statutory provisions, § 14-2-309(a)(iii) and (v):

(a) The parent-child legal relationship may be terminated if any one (1) or more of the following facts is established by clear and convincing evidence:

\* \* \*

(iii) The child has been abused or neglected by the parent and reasonable efforts by an authorized agency or mental health professional have been unsuccessful in rehabilitating the family or the family has refused rehabilitative treatment, and it is shown that the child's health and safety would be seriously jeopardized by remaining with or returning to the parent;

\* \* \*

(v) The child has been in foster care under the responsibility of the state of Wyoming for fifteen (15) of the most recent twenty-two (22) months, and a showing that the parent is unfit to have custody and control of the child;

[¶ 11] Termination of parental rights pursuant to § 14-2-309(a)(iii) requires the "establishment of three elements: (1) abusive treatment or neglect by the parent; (2) unsuccessful efforts to rehabilitate the family; and (3) the child's health and safety would be seriously jeopardized by remaining with or returning to the parent." *RS v. Dep't of Family Servs.*, 2004 WY 87, ¶ 12, 94 P.3d 1025, 1028 (Wyo.2004). Mother does not contest the district court's findings that the first two elements of subsection (iii) were satisfied. She focuses on the third element, claiming there was insufficient evidence to support the district court's conclusion that

the children's health and safety would be seriously jeopardized if they were returned to her.

[¶ 12] Under § 14–2–309(a)(v), DFS was charged with proving the children had been in foster care under the State's responsibility for fifteen of the most recent twenty-two months and that Mother was unfit to have custody and control of the children. *BSC v. Natrona County Dep't of Family Servs.*, 2004 WY 167, ¶¶ 30–31, 102 P.3d 890, 899 (Wyo.2004). Mother does not dispute the children have been in foster care, or otherwise under the State's responsibility,[3] for at least fifteen of the twenty-two months preceding the hearing. However, she does take issue with the district court's finding that she was unfit to have custody and control of the children. The evidence pertaining to whether the children's health and safety would be seriously jeopardized if returned to Mother is also relevant to the determination of whether she is unfit. *See, e.g., MN*, ¶¶ 28–31, 78 P.3d at 238–39. Consequently, we will consider, together, the disputed elements of subsections (iii) and (v).

■ [¶ 13] Mother claims DFS failed to prove the disputed elements by clear and convincing evidence because the evidence adduced at the final hearing showed she had substantially complied with the case plan. As described above, the June 2005 case plan identified a number of objectives and required Mother to fulfill certain tasks in advancement of the objectives. The first objective was for Mother to attain emotional stability and mental health and achieve a healthy parent-child relationship with her children. The plan specifically required that she attend individual therapy once a week. Mother attended her therapy sessions regularly, but, at some point, she and her therapist decided to reduce her appointments to twice per month. Mother apparently did not seek DFS approval for the change.

[¶ 14] The plan also required that Mother attend weekly family therapy sessions. She fulfilled that task. However, family therapist Kim Pexton testified the relationship be-

tween Mother and the children was not a healthy parent-child relationship, but was more of a peer relationship. She also stated there had been no significant change in the relationship between Mother and the children over the time she had been conducting family therapy.

[¶ 15] Jane Stearns, who counseled all three children individually, testified at both hearings. Ms. Stearns stated the children needed stability and structure and, when that was threatened, their behavior regressed. Like Ms. Pexton, Ms. Stearns did not see the relationship between Mother and the children as a normal parent-child relationship. She testified that AD was an especially challenging child, was not as emotionally stable as DD and KD, and tended to view her mother in the role of a girlfriend rather than a parent. Ms. Stearns was also concerned that DD had been given too many adult responsibilities while in Mother's custody. The counselor also indicated KD acted out after visits with Mother, and, when faced with the possibility of being returned to Mother's custody, DD became anxious.

[¶ 16] A DFS caseworker, who had worked with the family for over two years, echoed the therapists' assessment of the relationship between Mother and the children as being more of a peer relationship than a parent-child relationship. She testified Mother was reluctant to take on a parental role and assume the responsibilities for disciplining the children. The caseworker also questioned Mother's sincerity in implementing the parenting skills she had been taught, citing an example of Mother giving DD appropriate direction while being supervised by DFS staff, and then later, secretly telling him something different.

[¶ 17] The case plan also required that Mother support her children by maintaining full-time employment, providing health insurance and paying child support. At the time of the second hearing, Mother worked two part-time jobs, amounting to full-time employment. She had maintained her part-time

---

**3.** DD and KD have been in foster care, and AD has been placed in a group home and foster care at various times.

position with Pizza Hut during the entire six-month period between the hearings, but had exchanged a part-time position at A & W for a job delivering the Casper Star–Tribune during the same period. She obtained health insurance for herself and her children through her employment with Pizza Hut. With regard to her child support obligation, she testified her check from A & W was garnished while she worked there. After Mother left that position, she apparently did not make other arrangements to pay child support. Mother testified that before the second hearing she had received a letter indicating child support enforcement planned to start garnishing her Pizza Hut paycheck. Consequently, although it does appear Mother paid child support for the majority of the time, it was not of her own volition.

[¶ 18] The third objective of the plan required Mother to maintain a stable, safe and appropriate home. The family had a history of living in multiple, often unsuitable, residences. Mother was living in a trailer house at the time of the first hearing, but was behind in her rent payments. After the hearing, she was evicted and began staying with her parents, whose residence had previously been rejected as a suitable home for the children. Less than two months before the second hearing, she found another home. The DFS caseworker testified the home was physically appropriate, but expressed concern about the short time Mother had been able to maintain a suitable residence and her history of being unable to provide consistent appropriate shelter for her children.

[¶ 19] On a related matter, Mother did not have a support system of family and friends to help her with the children in times of difficulty. Mother testified the children's maternal grandmother could help her with childcare. However, Mother had reported in a psychological evaluation that her own childhood with the grandmother and her husband was wrought with abuse and neglect, bringing into question whether the maternal grandmother was an appropriate caregiver. Equally disturbing, AD had apparently shown some indication she had been sexually abused by one of Mother's relatives. When questioned about the possible danger her family members posed to the children, Mother testified that she would not break off the relationship with her siblings on the basis of an unsubstantiated report that AD had possibly been sexually assaulted, but if she regained custody of the children, she would not allow them to stay with any family members, other than her mother.

[¶ 20] It is obvious from this evidence that the possibility of Mother losing her current residence at some point in the future was substantial and she did not have a suitable alternative place to shelter the children should that happen. The lack of a history of maintaining an appropriate family home, together with the absence of a support system to help her in times of difficulty, undermined Mother's efforts to comply with the objective of maintaining a stable, safe and appropriate home for the children. *See AA v. Dep't of Family Servs.*, 2004 WY 82, ¶ 29, 93 P.3d 982, 990–91 (Wyo.2004) (indicating lack of stability in home is a factor to be considered in determining whether a child's health and safety would be seriously jeopardized by being returned to the parent's custody).

[¶ 21] The fourth objective required Mother to live a drug and alcohol free lifestyle. In April 2004, she tested positive for methamphetamine, leading to the requirement that she submit to random urinary analysis. Although all of the tests following the first one were negative, Mother had refused to be witnessed while providing the samples, and the DFS caseworker was, therefore, unable to validate the results of the tests. Nevertheless, the case worker testified at the second hearing that she did not believe Mother was using drugs or alcohol.

[¶ 22] The fifth objective concerned visitation with the children. Mother attended weekly visits with the children. However, she did not make arrangements for telephone visits, claiming conflicts between her work schedule and the children's activities. The other objectives were not within Mother's control.

[¶ 23] In addition to the testimony about the specific criteria included in the case plan, evidence was presented at the second hearing showing Mother still maintained a rela-

tionship with Father, who was incarcerated in a federal penitentiary. Father had a decidedly poor history as a parent, having been convicted of physical abuse of one of the children and of various other crimes. Mother was aware of his tendency to be violent with the children, and yet, Mother testified she still communicated with Father through letters and telephone calls and, within a few weeks prior to the second hearing, Mother had been to Colorado to visit him in the federal penitentiary. The psychological evaluation admitted into evidence at the initial hearing indicated Mother was emotionally dependent upon Father and the evaluator was concerned she would "tolerate situations which [would] place the children or herself at risk for harm." Although by all accounts Father would be imprisoned until after the children were grown and should not, therefore, pose a physical danger to the children if they were returned to Mother, the DFS caseworker testified that Mother's history with Father demonstrated she was inclined to place her romantic relationships ahead of her relationship with the children.

[¶ 24] The family therapist, Ms. Pexton, also opined that, because of the level of instability in Mother's situation, she did not believe Mother was a fit parent and that the children's health and safety would be jeopardized by being returned to Mother's care. The children's individual counselor, Ms. Stearns, expressed the opinion that the children would suffer a serious regression in their emotional well-being if they were returned to Mother and then, potentially, had to be removed from her custody again because of her lack of stability. The DFS caseworker testified she believed the children's health and safety would be seriously jeopardized if they were returned to Mother. Even Mother's therapist, who testified on her behalf, could only state that she "would hope" Mother could eventually be reunified with the children.

[¶ 25] After considering the family's history and the evidence presented at both termination hearings, the district court made the following pertinent findings:

The simple facts are that despite her well-intended efforts to get her own life on track, [Mother] has had three different residences in the last six months, has changed jobs once, and continues to have a friend-friend relationship with her children as [o]pposed to a parent-child relationship.

The undisputed evidence in this case is that the children need structure and stability. The clear and convincing evidence is that even after almost three years in foster care, [Mother] is not yet ready to provide that structure and stability for her children.

The Court realizes that terminating parental rights is a drastic measure. Six months ago I was not willing to take that step and was hopeful that significant progress would occur so as to allow reunification. Now the best interests of the children must come to the forefront. Three years of effort to reunify is enough. The children need security, stability and finality. The clear and convincing testimony from Ms. Pexton and Ms. Stearns is that these children are not yet ready to return to their mother and that another failure would be disastrous to the children. Furthermore, there was not a clear picture of when, if ever, reunification would be successful.

Therefore, this Court must conclude, based on clear and convincing evidence, that the children's health and safety would be seriously jeopardized by returning to [Mother] and that at this time [Mother] is unfit to have custody and control of the children.

■ [¶ 26] Mother argues that the district court erred by failing to recognize her compliance with the case plan and should have measured her fitness by her situation at the time of the second hearing. In *MN*, ¶ 13, 78 P.3d at 236, we recognized courts often consider the family's history over a long period of time in determining whether parental rights should be terminated.

We have previously recognized that in the ordinary parental rights termination case consideration must be given to a combination of factors, incidents, and conditions that demonstrate the neglect required to justify termination of parental rights. Rarely do we find a single condition or

incident that, standing alone, would justify termination. Rather, neglect is usually manifested by numerous incidents and conditions extending over a considerable length of time. See *TR v. Washakie County Dep't of Pub. Assistance and Soc. Servs.*, 736 P.2d 712, 716 (Wyo.1987); *Matter of MLM*, 682 P.2d 982, 988 (Wyo.1984). *Id. See generally, RS*, 2004 WY 87, 94 P.3d 1025 (recognizing parent's pattern of behavior established basis for termination). Thus, the district court properly considered the entire history of the family in making its decision.

[¶ 27] The district court acknowledged Mother's efforts leading up to the second hearing; however, it concluded, based upon the long period of time the children had been in DFS custody, the relative short period Mother had attempted to comply with DFS requirements, the lack of complete compliance with the directives, and the need for a final resolution of the case, Mother's parental rights must be terminated. We cannot fault the district court's reasoning. Although Mother presented evidence that she had complied with several of the tasks assigned to her in the case plan, she did not complete all of the tasks and, more importantly, the evidence showed the overall objectives of the plan were not achieved.

[¶ 28] Several of the objectives could not be measured by the sheer accomplishment of a specific task. For example, the first objective required Mother to achieve a healthy parent-child relationship with her children. She was given certain tasks in order to help her fulfill that objective, including attending individual and family therapy and completing parenting classes. These tasks were meant to provide her with tools to help her obtain the ultimate goal; however, the objective would not necessarily be accomplished by rote completion of the tasks. Instead, determination of whether the objective had been met required a qualitative measure. The therapists who testified on behalf of DFS stated that, while Mother made an effort to complete the tasks, she did not achieve a healthy parent-child bond.

[¶ 29] Similarly, objective three required Mother to maintain a safe, stable and appropriate home. She claims she satisfied this objective by obtaining an appropriate home before the second hearing. Again, she misses the overall point. The case plan, agreed to in June of 2005, required she maintain a stable and acceptable home for the children without the presence of other family members. And yet, she lived with her parents, in what had been determined an unacceptable environment, for part of the six months between the two hearings. The determination of whether or not a home is "stable" requires a qualitative judgment. The fact that she had an appropriate home for a short period of time prior to the second hearing was not sufficient to override the long history of multiple, inappropriate homes.

[¶ 30] Because the determination of the ultimate issues in this case required a review of subjective, qualitative factors, the district court was required to gauge the credibility and sincerity of the witnesses. "It was within the district court's province to weigh the evidence and judge the credibility of the witnesses." *CJ v. SA*, 2006 WY 49, ¶ 18, 132 P.3d 196, 203 (Wyo.2006). *See also, RS*, ¶ 34, 94 P.3d at 1033–34. The district judge actually sat in the courtroom and observed the demeanor of the witnesses; consequently, he was in the best position to make those difficult factual determinations. In accordance with our standard of review, we defer to the district court's evidentiary findings and conclude sufficient evidence exists to support the district court's decision to terminate Mother's parental rights.

[¶ 31] This is a classic case where the best interests of the children diverge from the fundamental rights of the parent. In similar circumstances, we have said: " 'When the rights of a parent and the rights of a child are on a collision course, the rights of the parent must yield.' " *SD v. Carbon County Dep't of Family Servs.*, 2002 WY 168, ¶ 27, 57 P.3d 1235, 1241 (Wyo.2002), quoting *Matter of MLM*, 682 P.2d 982, 990 (Wyo.1984). While parents have a fundamental right to raise their children, children have a right to stability and permanency in their family relationships. Section 14–2–309(a) recognizes there must be limits on the

amount of time DFS will attempt to rehabilitate a parent while the children remain in foster care. The time limits recognize that the children's right to stability and permanency is superior to the parent's right to familial association. *See, e.g., In re Guardianship of K.H.O.*, 161 N.J. 337, 736 A.2d 1246 (1999) (holding there is "a strong public policy in favor of permanency ... [and][i]n all our guardianship and adoption cases, the child's need for permanency and stability emerges as a central factor.").

[¶ 32] Sections 14-3-309(a)(v) and 14-3-431(m) incorporate federal mandates which provide, in order to receive federal welfare funds, state laws must require the responsible state agency to initiate termination proceedings if a child has been in foster care for fifteen of the most recent twenty-two months. *See,* e.g., 42 U.S.C. §§ 670 *et. seq.* (codifying many federal child welfare laws, including the Adoption Assistance and Child Welfare Act of 1970 (P.L. 96-272), the Adoption and Safe Families Act of 1997 (ASFA) (P.L. 105-89, 111 Stat. 2115), and Strengthening Abuse and Neglect Courts Act of 2000 (P.L. 106-314)). The purpose of the federal laws is to "respond to the needs of children lost in the foster care system by promoting permanency through reunification or adoption." L. D'Ambra, RIGHTS OF CHILDREN IN TERMINATION OF PARENTAL RIGHTS CASES: A REVIEW OF FEDERAL AND STATE LAW INVOLVING PARENTS WITH A MENTAL OR DEVELOPMENTAL DISABILITY, 20 Child. Legal Rts. J. 2, 3 (Summer 2000). The federal government recognized that the permanency decision, whether it is to reunify or adopt, must be made within a reasonable amount of time.

By providing stricter time-frames, ASFA tried to prevent children from remaining indefinitely in foster care. ASFA's new requirements increase the accountability of parents through shortened time-frames, which may act as an impetus to permanency. Under ASFA, parents are given shorter time-frames to work on issues that caused the child to be removed by the state.

*Id.* at 4. The Wyoming legislature followed the federal lead and adopted statutes which require the parent to rehabilitate, with the aid of state services, within a reasonable amount of time. Failing that, the children's interest in permanency commands that the parent's rights be terminated so that the child will be available for adoption.

[¶ 33] In the case at bar, Mother made significant efforts to rehabilitate herself, but she did not, and perhaps could not, make sufficient progress within a reasonable amount of time. At the time of the second hearing, the children had been placed out of the home for nearly three years. For much of that time, Mother did not consistently comply with DFS requirements in order to be reunified with the children. As the district court recognized, at the time of the second hearing there still was no clear indication of when, if ever, Mother would be sufficiently rehabilitated to provide the children with the stability necessary to allow reunification. The lack of a clear resolution of the case was emotionally disturbing to the children and interfered with their progress in becoming healthy and well-adjusted. Under these circumstances, it was entirely appropriate for the district court to favor the children's right to permanency and terminate Mother's parental rights.

## CONCLUSION

[¶ 34] The district court's order terminating Mother's parental rights to DD, AD, and KD, pursuant to § 14-2-309(a)(iii) and (v), was supported by clear and convincing evidence. The district court properly considered DFS' efforts to reunify this family and Mother's efforts to rehabilitate herself over the entire three year period these children were in foster care, and the district court reasonably concluded the interests of the children in a safe and stable home outweighed Mother's rights as a parent.

[¶ 35] Affirmed.

HILL, Justice, dissenting, with whom GOLDEN, J., joins.

[¶ 36] I respectfully dissent because I do not agree that the record on appeal contains clear and convincing evidence that mandates the termination of CL's parental rights to her three children (DD born 2/15/93; AD

born 2/9/94; KD born 1/13/97). I reach this conclusion in the light of our many decisions that hold the termination of parental rights is a matter over which we exercise "strict scrutiny" and that the applicable evidentiary standard is clear and convincing evidence. I also take into account the circumstance that we apply our traditional principles of evidentiary review (i.e., "... examine the evidence in the light most favorable to the party prevailing below, assuming all favorable evidence to be true while discounting conflicting evidence presented by the unsuccessful party."). See, e.g., *In re ANO*, 2006 WY 74, ¶ 7, 136 P.3d 797, 799–800 (Wyo.2006).

[¶ 37] By order entered on June 28, 2005, the district court found that the children at issue had been adjudicated neglected and that they had been in foster care for more that fifteen of the most recent twenty-two months. However, it also found that there was not clear and convincing evidence to support termination of CL's parental rights, there was not clear and convincing evidence that returning the children to CL would seriously jeopardize the three children's health and safety, and there was not sufficient evidence that CL was unfit to have the custody and control of her three children.

[¶ 38] The district court also directed DFS to "continue to make efforts to rehabilitate ... for no longer than six months." CL was ordered to comply with the following requirements:

1. The kids will remain in the custody and care of the State of Wyoming, Department of Family Services until further ordered.

2. [CL] will comply with every request and or demand of the Department of Family Services and her case worker, Katrina Price.

3. [CL] will immediately contact the Department of Family Services to create a new case plan for reunification.

4. [CL] will maintain full-time employment.

5. [CL] will abstain from using drugs or alcohol.

6. [CL] will maintain appropriate healthcare for the three minor children.

7. [CL] will maintain a safe and appropriate home and keep current with all past due and future rent. [CL] will have NO pets or animals of any kind at her home.

8. [CL] will continue her weekly individualized counseling sessions at Peak Wellness Center with Brenda Kofford or any other counselor as deemed necessary.

9. [CL] will continue with visitation as arranged by the Department of Family Services and will be on time to all scheduled visits. If [CL] cannot attend a visitation because of transportation problems, she will notify the Department of Family Services immediately to arrange an alternate visitation.

10. [CL] will keep current with any future child support payments and she will make arrangements with Child Support Enforcement to pay back any outstanding arrearages.

[¶ 39] A Case Plan was formulated and it is appended to Vol. IV of the record on appeal (and accurately summarized at pp. 4–5 of the published opinion). The district court conducted a hearing on November 1, 2005, to take evidence concerning CL's progress during the preceding six months. I have read that transcript from cover to cover (188 pages). Although CL did not comply 100% with the directives of the district court and the supervising DFS case worker, even the district court conceded that CL's efforts were "to a large extent ... successful." Examination of that transcript leaves me with the impression that CL did about as well at complying with the district court's and DFS's directives as any person could have been expected to do. The following items are undisputed in the record. (1) CL is at once required to maintain full-time employment, and faulted that she will not be at home enough because she works full-time or more. (2) She is faulted for losing a part-time job at A & W, although she lost that job because she left work so as not to miss a visitation that was set on a new schedule. (3) She is faulted for going to her therapist only twice a month, even though her therapist testified that in her professional judgment CL had progressed so far that she required only every-other-week sessions (and also, thus, to

avoid over dependence on the therapist). CL's home is characterized as being a "threat to her children's health and safety," and CL is characterized as "unfit" because she did not reach her goals 100%. However, I do not see any evidence to support those conclusions, much less clear and convincing evidence. The only evidence to support those conclusions is the minor failings detailed in the district court's decision letter.

[¶ 40] I also perceive that DFS took the position in this case that if the district court were to decide to return the children to their mother's custody and control, then DFS should "not be involved with this family any further . . .:"

> . . . Because when the children were returned to the home for a very short period of time [in 2003], they had to be removed. And I can foresee—to make an educated guess, that could happen. And I am just not sure that it would be better for them at all to be removed again. They would almost be better off just to stay in the family and fend for themselves.
>
> And it is my opinion, that—you know, if we're going to wait for children to grow up enough to put them back in the home and fend for themselves, then family services needs to be taken out of it. Because it is just too detrimental for them to be taken out again.

I view this as the sort of hysteria and irrationality that justifies the high standards set by the governing statutes and our standard of review with respect to the termination of parental rights. It appears that both DFS and the district court took the position that there would be a six-month grace period for CL, and then her parental rights would be terminated so long as there was some thread of failure to grasp onto.

[¶ 41] I cannot agree that this record justifies the use of the statutory guillotine on CL. I would remand this case to the district court with instructions that it direct DFS to continue to provide needed services to this family, including CL. It may be that those efforts will never result in the ideal of complete reunification. However, these children are now 14, 13, and 10 years-of-age, and it is difficult for me to grasp how termination of CL's parental rights is going to improve their lot.