2003 WY 135

**In the Interest of MN, a minor.**

**MN, Appellant (Respondent/Natural Mother),**

v.

**The State of Wyoming, Department Of Family Services, Appellee (Petitioner).**

**No. C–03–3.**

Supreme Court of Wyoming.

Oct. 24, 2003.

Representing Appellant: Marcia E. Bean, Carrol S. Nelson, and Wendy S. Owens of Wyoming Legal Services, Inc. Argument by Ms. Bean.

Representing Appellee: Patrick J. Crank, Attorney General; Michael L. Hubbard, Deputy Attorney General; Dan S. Wilde, Senior Assistant Attorney General; and Nicole G. Krieger, Special Assistant Attorney General. Argument by Ms. Krieger.

Before HILL, C.J., and GOLDEN, LEHMAN, KITE, and VOIGT, JJ.

LEHMAN, Justice.

[¶1] The mother of MN, a minor child, appeals the district court order terminating her parental rights. Mother primarily asserts that the district court erred when it found clear and convincing evidence upon which to terminate her parental rights. Upon review, we affirm.

### ISSUES

[¶2] Mother raises the following issues on appeal with which appellee State of Wyoming, Department of Family Services (State), essentially agrees:

1. Whether there is clear and convincing evidence that Appellee met the statutory requirements of Wyo. Stat. § 14–2–309(a)(iii).

2. Whether Appellee violated the state and federal Constitutions and state law when it failed to follow its own internal rules, regulations and procedures.

3. Whether Appellant's right to counsel at the initial hearing as required by Wyo. Stat. § 14–3–422 was violated.

4. Whether the District Court erred when it admitted certain laboratory tests without proper foundation or chain of custody established.

### FACTS

[¶3] On May 12, 1999, a neglect petition was filed with the district court. Although Mother requested appointment of an attorney, she was advised that the public defender's office did not handle such cases, and the court did not appoint an attorney for her. Mother then admitted to the allegations of neglect. In July 2000, Mother hired an attorney to represent her in the juvenile proceedings.

[¶4] On April 18, 2002, the State filed a petition to terminate Mother's parental

rights to MN, and counsel was appointed for Mother. Mother retained separate counsel in late April 2002, at which time the court appointed counsel in the termination matter was allowed to withdraw.[1] The State then filed an amended petition on May 1, 2002. After a five-day trial, the district court terminated Mother's parental rights to MN pursuant to Wyo. Stat. Ann. § 14–2–309. This appeal followed.[2]

## STANDARD OF REVIEW

[¶ 5] When setting forth our standard of review for the granting of a petition to terminate parental rights we have said:

Due to the tension between the fundamental liberty of familial association and the compelling state interest in protecting the welfare of children, application of statutes for termination of parental rights is a matter for strict scrutiny. *TR v. Washakie County Dep't of Pub. Assistance & Soc. Servs.*, 736 P.2d 712, 715 (Wyo.1987). As part of this strict scrutiny standard, a case for termination of parental rights must be established by clear and convincing evidence. Wyo. Stat. Ann. § 14–2–309(a) (Michie 1997); *In Interest of JG*, 742 P.2d 770, 773 (Wyo.1987); *D.S. v. Dep't of Pub. Assistance & Soc. Servs.*, 607 P.2d 911, 919 (Wyo.1980). Clear and convincing evidence is that kind of proof that would persuade a trier of fact that the truth of the contention is highly probable. *Matter of GP*, 679 P.2d 976, 982 (Wyo.1984). Rigorous though this standard may be, we apply our traditional principles of evidentiary review when a party challenges the sufficiency of the evidence supporting termination. *Matter of SYM*, 924 P.2d 985,

987 (Wyo.1996). Thus, we examine the evidence in the light most favorable to the party prevailing below, assuming all favorable evidence to be true while discounting conflicting evidence presented by the unsuccessful party. *Id.; D.S. v. Dep't of Pub. Assistance & Soc. Servs.*, 607 P.2d at 919–20; *In Interest of JG*, 742 P.2d at 773.

*In Re ZKP*, 979 P.2d 953, 956 (Wyo.1999); *see also SD v. Carbon County Dep't of Family Servs.*, 2002 WY 168, ¶ 5, 57 P.3d 1235, ¶ 5 (Wyo.2002); *Matter of TLC*, 2002 WY 76, ¶¶ 10–11, 46 P.3d 863, ¶¶ 10–11 (Wyo.2002); *In Re IH*, 2001 WY 100, ¶ 14, 33 P.3d 172, ¶ 14 (Wyo.2001).

## DISCUSSION

### Termination of Parental Rights

[¶ 6] The State's amended petition for termination of parental rights requested termination based on Wyo. Stat. Ann. §§ 14–2–309(a)(iii) and 14–2–309(a)(v) (LexisNexis 2001).[3] The district court found clear and convincing evidence to support termination on both of these grounds. Mother contends the decision of the district court should be reversed because the State did not present clear and convincing evidence that she neglected MN and the State did not make reasonable efforts to prevent the removal of MN from Mother or to reunify the family. The State argues that more than adequate evidence exists to support the district court's ruling and that Mother simply improperly characterizes the evidence presented at trial.

[¶ 7] Termination of parental rights pursuant to § 14–2–309(a)(iii) initially requires the establishment of parental abuse or ne-

---

1. Apparently, the State initially filed a petition to terminate mother's parental rights on October 17, 2001. This petition was eventually dismissed by the court upon Mother's appointed counsel filing a motion to dismiss.

2. Because Mother challenges the factual basis of the district court's ruling on appeal, further facts will be included in the body of this opinion.

3. Wyo. Stat. Ann. § 14–2–309(a)(iii) provides that parental rights may be terminated if it is established by clear and convincing evidence that the child has been abused or neglected by the parent and reasonable efforts by an authorized agency or mental health professional have been

unsuccessful in rehabilitating the family, or the family has refused rehabilitative treatment, and it is shown that the child's health and safety would be seriously jeopardized by returning to the parent.

Wyo. Stat. Ann. § 14–2–309(a)(v) provides for the termination of parental rights if it is shown by clear and convincing evidence that the child has been in foster care under the responsibility of the state of Wyoming for fifteen of the most recent twenty-two months, and a showing that the parent is unfit to have custody and control of the child.

glect by clear and convincing evidence. *SD v. Carbon County Dep't of Family Servs.*, at ¶ 5. "Abuse" means inflicting or causing physical or mental injury, harm or imminent danger to the physical or mental health or welfare of a child other than by accidental means, including abandonment, excessive or unreasonable corporal punishment, malnutrition or substantial risk thereof by reason of intentional or unintentional neglect, and the commission or allowing the commission of a sexual offense against a child as defined by law. Wyo. Stat. Ann. § 14–3–202(a)(ii) (LexisNexis 2001). "Neglect" means "a failure or refusal by those responsible for the child's welfare to provide adequate care, maintenance, supervision, education or medical, surgical or any other care necessary for the child's well being." Wyo. Stat. Ann. § 14–3–202(a)(vii) (LexisNexis 2001).

■ [¶ 8] The evidence presented to the district court showed that in 1996, when MN was two years old, the State received information that Mother was giving MN alcohol in an infant cup and shaking out and re-using diapers. In July 1997, the State received a report that MN was being watched by inappropriate male caregivers who were drinking and driving with MN and bringing her to the local bar, that MN's teeth had rotted, and that she was being fed a diet of only soda and candy.[4] It was also reported that MN was left playing on the road while Mother was passed out in her car, that MN was being left on numerous occasions unattended in a bar while Mother drank, and MN was being transported in an unsanitary vehicle full of rotted food and garbage. In October of 1997, law enforcement contacted the State again with concerns regarding MN's teeth. In December of 1997, Mother took MN to visit her mother in Las Vegas, Nevada and, although MN was then three and a half years old, fed her primarily Coca Cola and sweets. Mother also failed to monitor MN in the bathroom, which led to MN smearing feces all over a restroom.

[¶ 9] In January and February 1998, MN's daycare provider made two referrals to the State reporting that MN was arriving at the daycare hungry, dirty, and smelling like urine. The daycare also reported that MN often had caked food on her, expressed concerns about her teeth, and reported that the only food Mother brought to the daycare were sweets. MN was also developmentally behind other children of her age, had difficulty interacting with her peers, and would have lengthy screaming fits. On May 28, 1998, the State received a report that Mother and MN were living in a hazardous, filthy apartment filled with dog feces. The State investigated and found the apartment filled with flies, feces, garbage, and rotting food. However, by then Mother and MN had vacated the apartment. The State formally substantiated this claim. In August of 1998, the State received complaints that Mother's campsite was a mess and that all MN was eating was candy, soda, and other sugary foods.

[¶ 10] In February of 1999, the State received another complaint that Mother had dropped off MN on the doorstep of a co-worker's home without making any previous arrangements and drove off before anyone answered the door, leaving MN overnight. It was also reported that MN's underwear was black with dirt, her sleeping bag was "filthy," and that Mother's apartment was filled with junk and had no food. The State formally substantiated these claims, leading to the instigation of neglect proceedings and Mother voluntarily placing MN with her aunt, Ms. Griffin.

[¶ 11] When MN, then almost five years of age, was placed at Ms. Griffin's home, she was unfamiliar with eating utensils, did not know what toilet paper was or how to use it, hoarded food despite being given sufficient food, and would go up to strangers to hug them and sit on their laps. In December of 1999, MN was moved to a foster family home in Osmond, Wyoming, approximately five miles from Afton, Wyoming. Mother could not be contacted regarding this change because she had moved and did not provide the State with contact information. When MN

4. Statements were also made which gave concerns that MN may have also been sexually abused.

arrived at the new foster home, she had no top teeth, had bridges on her bottom teeth, and preferred to eat only sweets. She would also scream for hours without any tears when she did not get her way, struggled with peer interaction, was underdeveloped, and preferred to be with adults all the time. She continued to go up to strangers and hug them.

[¶ 12] In March of 2000, MN began seeing Gale Holtby, MA, LPC, a professional counselor specializing in the area of child maltreatment. This counseling continued through the trial held in July 2002. Ms. Holtby diagnosed MN as being developmentally and emotionally delayed, having an attachment disorder, having difficulty connecting with others, and having a basic mistrust of the world. Ms. Holtby further stated that MN suffered from Attention Deficit Hyperactivity Disorder (ADHD), that she had poor motor skills, and that she needed constant attention and prompting with hygiene and eating. Ms. Holtby further testified that these difficulties were likely caused by the inconsistent care given by Mother, as MN's primary caregiver, during her first years of life.

[¶ 13] Mother criticizes the evidence presented at trial and characterizes it simply as a showing of five unsubstantiated reports of alleged neglect and two reports of neglect that were substantiated at low risk. Therefore, Mother concludes that this factual foundation is insufficient to terminate her parental rights to MN. We have previously recognized that in the ordinary parental rights termination case consideration must be given to a combination of factors, incidents, and conditions that demonstrate the neglect required to justify termination of parental rights. Rarely do we find a single condition or incident that, standing alone, would justify termination. Rather, neglect is usually manifested by numerous incidents and conditions extending over a considerable length of time. *See TR v. Washakie County Dep't of Pub. Assistance and Soc. Servs.,* 736 P.2d 712, 716 (Wyo.1987); *Matter of MLM,* 682 P.2d 982, 988 (Wyo.1984).

[¶ 14] As in *TR,* the neglect in this case extended over a long period of time and is apparent by the occasions and conditions described by the witnesses and in the exhibits. The record discloses long-term general neglect, and the detailed instances are adequate to show by clear and convincing evidence the failure to provide adequate care necessary for MN's well being. Thus, at a minimum, neglect, if not abuse, is presented.

[¶ 15] We now address the second element, unsuccessful reasonable attempts to rehabilitate the family. When family reunification is the case plan goal, the State has the responsibility reasonably to provide the services necessary to accomplish the specific goals and tasks called for before reunification can occur. *SD v. Carbon County Dep't of Family Servs.,* at ¶ 16; *MB v. Laramie County Dep't of Family Servs. in Interest of LB,* 933 P.2d 1126, 1129–30 (Wyo.1997). The record is filled with instances of the State meeting this responsibility.

[¶ 16] The State attempted to assist Mother following each report in 1997 and 1998, but Mother refused such assistance. The State initiated a case plan and worked with Mother in February of 1998. However, after a short period of time, Mother could not be reached. In 1997 and 1998, the State met with Mother on a number of occasions to discuss nutrition for MN and worked to help Mother obtain more stable employment and housing.

[¶ 17] Prior to the initiation of the juvenile court proceedings, the State initiated a second case plan and made repeated efforts to help Mother, providing her with Medicaid, money for daycare, food stamps, and other financial assistance. The State also gave Mother additional education on nutrition, hygiene, and care of MN and encouraged Mother to work with the State Department of Vocational Rehabilitation (DVR) to develop job stability and low-income housing. Furthermore, the State worked with Mother to arrange and pay for dental care for MN.

[¶ 18] After the juvenile court proceedings commenced, the State initiated four separate case plans, but Mother failed to comply with these plans. A multidisciplinary team (MDT) was convened consisting of Mother, state caseworkers, Mother's mental health

counselor, Mother's case manager, a psychologist, DVR, and MN's guardian ad litem. An individual experienced in working with brain-injured individuals also provided training to the MDT and Mother's case manager because Mother had been diagnosed with a cognitive disorder and a moderate to severe brain injury. Despite numerous efforts by the State and the MDT to rehabilitate Mother, Mother failed to comply with the case plans, was generally uncooperative, and refused to participate in the many services offered to her. Ultimately, Mother became hostile and discontinued all services. Mother's visitation with MN was also erratic and ultimately ceased.

[¶ 19] Mother complains that the State is required to make reasonable efforts to preserve the family *prior* to placement of the child outside the home and asserts that the State did not comply with this requirement. However, the record discloses that the State did not formally remove MN from her home after the 1999 allegation of neglect. To the contrary, MN was placed with Ms. Griffin, Mother's aunt, at Mother's request. Indeed, Mother admits to this request and her intent to keep MN away from the State to prevent the State from intervening.

[¶ 20] In addition, Mother argues that the State did not use reasonable efforts to reunify the family, as the implemented case plans were not accessible, available, appropriate, and did not sufficiently account for Mother's known memory and cognitive difficulties. The evidence presented at trial describes how the State on numerous occasions conducted one-on-one discussions with Mother addressing the State's concerns regarding proper care, nutrition, and supervision for MN and proper housing and stability. Initially, Mother accepted the services that resulted in direct financial assistance, but rejected the services that required her to address lifestyle and parenting choices, contending that MN's care was not the State's concern. Testimony at trial detailed the extensive attempts made to equip Mother with the skills she needed to effectively raise MN utilizing simplistic incremental steps. These plans were developed and approved by the entire MDT using a collaborative approach. Moreover, each of the case plans increasingly took into account the particular needs of Mother, as more information became available. Nevertheless, Mother resisted these rehabilitative efforts.

[¶ 21] The initial case plan required that Mother work with her case manager to develop a schedule to fit her work and personal needs; work on budgeting, housing and work opportunities; visit with MN regularly in person and via telephone; participate in regular counseling sessions; schedule a neuropsychological evaluation with DVR; and maintain regular contact with the State. The next case plans developed included similar tasks but added finishing a parenting assessment; keeping transportation and insurance; and working with an attorney on other potentially available services. Each of the case plans remained consistent in nature. The State and the MDT went to great lengths to ensure that Mother understood the case plans, what was required of her, and that the objectives were reasonable and well suited to her needs.

[¶ 22] Mother's appointed counselor, John Beck, M.Ed., had over twelve years of experience as a counselor specializing in adults with mental illnesses, including persons with brain injury disorders and families in dysfunction. Mr. Beck worked with Mother to help her understand MN's needs as contrasted to her own, on communication and its relationship to parenting, problem solving, and other parenting skills. Mr. Beck, recognizing that Mother was resistant to counseling and had missed numerous sessions, arranged to meet with Mother after hours or during her lunch break and later accommodated Mother's request for half hour sessions, rather than full hour sessions, hoping that Mother would be more receptive. Mother was also assigned a case manager from the Jackson Hole Community Counseling Center to work with her on issues relating to general organization, budgeting, keeping appointments, and problem solving under the oversight of Mr. Beck. Mother initially refused to work with the first counselor and another counselor was assigned who met with her at her worksite. This new counselor received specialized training in working

with brain-injured clients in the area of problem solving, organization, and basic skills. The counselor met with Mother in Jackson, where she worked, and in Pinedale, where she lived.

[¶ 23] After the juvenile proceedings were commenced, Mother expressed some willingness to participate with the State, cooperate with the case plans, and was receptive to the services made available. However, Mother failed to participate in the offered services with regularity. Mother then became more hostile towards the State and other service providers, did not cooperate with the MDT, and eventually rejected all rehabilitative services. Mother also failed to maintain regular visitation with MN. Regularly scheduled telephone calls with MN were often also missed by Mother.

[¶ 24] Mother's complaints that regular visitation was made difficult by distance, transportation problems, and State's unwillingness to facilitate her visits are unpersuasive. The State accommodated Mother by offering transportation to Jackson and Pinedale on occasion and attempted to assist Mother in figuring out her transportation dilemma. Critically, Mother was able to travel between Pinedale and Jackson for work, yet could not do so for visitation purposes.

[¶ 25] Throughout interaction with Mother, the State and the MDT assigned Mother appropriate case managers and helped set up and pay for evaluations in the substance abuse, psychological, neuropsychological, and parenting areas. The State also provided Mother with assistance and transportation in obtaining low-income housing applications. In addition, case workers conducted meetings with Mother at a restaurant after business hours where Mother felt more comfortable and her work schedule would not be interrupted. At these meetings, the State reviewed Mother's progress and need for improvement in other areas. A note taker was provided by DVR for Mother.

[¶ 26] Mother asserts that she was unable to understand the case plans because of her cognitive and memory problems. However, Mother testified at trial that she understood what it meant to obtain evaluations, see her counselor, and take the other actions required by the case plans. Mother also testified that she understood the consequences that would result if she failed to comply with the case plan directives.

[¶ 27] We have previously recognized that at some point rehabilitative efforts become unreasonable. "[I]t would seem unreasonable and not for the best interests of the child that professional welfare workers should be furnished to care for this child in the parental home on a twenty-four-hour basis for the many years until the child herself can be self-sufficient." *Matter of CM*, 556 P.2d 514, 519 (Wyo.1976). The record indicates that Mother, even after lengthy attempts at training and instruction, would not be able to care for MN without further significant assistance. While we are empathetic to Mother's limitations due to a brain injury, we must consider the best interests and welfare of MN. *Id.,* at 517; *see also SD v. Carbon County Dep't of Family Servs.,* at ¶ 23. Mother failed to take advantage of the services provided to her, failed to meaningfully participate in the case plans, and failed to implement what she was taught. Thus, we hold the evidence was clear and convincing that the reasonable rehabilitative efforts were unsuccessful.

[¶ 28] Finally, we consider the last element of § 14–2–309(a)(iii), that MN's health and safety would be seriously jeopardized should she be returned to mother's custody. A child evaluation was completed which indicated that MN required a safe, stable, secure, and predicable environment. Such environment would encompass repetition to help MN develop trust in others, decrease anxiety level, and change the behaviors associated with her attachment disorder. While in foster care, MN's emotional health and basic ability to interact with others greatly improved, and MN made significant strides in terms of social skills, temper, and attention. However, MN remained immature and had significant needs in terms of mental, emotional, and physical well being.

[¶ 29] From 1997, Mother's life has been unstable. Mother was unable to hold down a job for more than a few months and had

difficulty getting along with co-workers. Since 1997, Mother has moved between thirteen different campsites, motel rooms, and apartments. At the time of the trial, Mother had been living with a boyfriend who had at least four alcohol-related encounters with law enforcement, and, in 2001, the police were called twice to Mother's residence because of domestic disputes. Between October 2000 to July 2001, Mother had twenty-six positive drug screens for marijuana and one for methamphetamine.

[¶ 30] Despite the efforts of the State, Mother made minimal progress toward being able to meet MN's needs. Mother also continued to have difficulty in identifying and anticipating MN's needs, avoiding problems, recognizing potential dangers, and organizing her life to provide consistency, stability, and safety. Mother also had problems with memory, reasoning, planning, anger, and attention, which made it difficult for her to be a parent. Continued drug abuse by Mother caused her to be more unlikely to succeed as a parent. Mother was simply unable to provide the level of care MN required, or to even meet MN's more basic fundamental needs.

[¶ 31] Accordingly, evidence was presented to the district court to establish that each of the three criteria required by Wyo. Stat. Ann. § 14–2–309(a)(iii) had been met by clear and convincing evidence. Moreover, clear and convincing evidence was presented to the district court that the requirements of Wyo. Stat. Ann. § 14–2–309(a)(v) had also been met since MN had been in foster care under the responsibility of the State for at least fifteen of the most recent twenty-two months, and Mother was shown to be unfit to have custody and control of MN. Parental rights may be terminated on a finding of just one of the stated subsections enunciated in § 14–2–309. *SD v. Carbon County Dep't of Family Servs.*, at ¶ 6; Wyo. Stat. Ann. § 14–2–309.

[¶ 32] This court has recognized that:

We are not unsympathetic to the disabilities and hardships of the parents. However, this case demonstrates a situation in which the best interest of the child and the fundamental rights of the parents diverge.

While we zealously guard the fundamental right of parents to care for and associate with their children, we also recognize that a child has the fundamental right to live in an environment free from filth, health hazards, and danger; he also has the right to nourishment, education, and necessary medical attention. *Matter of MLM*, 682 P.2d 982, 990 (Wyo.1984). "When the rights of a parent and the rights of a child are on a collision course, the rights of the parent must yield." *Id.*

*SD v. Carbon County Dep't of Family Servs.*, at ¶ 27

[¶ 33] For the reasons stated above, we find that there was clear and convincing evidence presented to support the termination of parental rights.

### Alleged Violations of Rules and Regulations

■ [¶ 34] Mother contends that the State did not comply with its own internal rules and regulations, thereby violating her constitutionally protected due process rights. However, the State's procedural manual cited heavily by Mother as support for these violations is not a part of the appellate record. The only rule violation established at trial was that the State was fifteen days late in creating a case plan on one occasion. Mother fails to demonstrate how this violation affected her fundamental rights or impacted the ultimate decision of the district court to terminate her parental rights to MN. Therefore, we find that any non-compliance by the State in this case is harmless. Furthermore, although Mother relies heavily on the case of *MB v. Laramie County Dep't of Family Servs. in Interest of LB*, 933 P.2d 1126, for support of her argument, that case is not dispositive. In *MB*, this court held that the State's rule violations were both numerous and egregious, thus violating the parent's protected rights. In this instance, any alleged violations by the State were minimal in nature.

■ [¶ 35] Clearly, an agency must follow its own rules as they have the force and effect of law. However, a person asserting an agency's rule violations must show how

the breach denied her due process or violated her fundamental rights.

### Failure to Appoint Counsel

[¶ 36] Mother asserts that the court violated her right to counsel at the initial juvenile proceeding hearing and, thus, the district court was divested of subject matter jurisdiction. Specifically, Mother espouses that the failure to appoint counsel during the initial hearing is of such a serious nature that it undermines the State's entire termination case. The State primarily argues that a neglect action is not a prerequisite to a termination of parental rights proceeding, and the two are separate and distinct. The State further argues that there has been no showing that Mother's rights were prejudiced, or even impacted, and therefore the court's action must be characterized as harmless.

[¶ 37] Initially this court recognizes that termination proceedings are entirely separate and distinct from neglect proceedings, deriving their respective genesis from separate statutes and requiring different burdens of proof. In particular, a neglect action is not a mandatory prerequisite to termination of parental rights. Moreover, Mother has failed to show how the failure to appoint her counsel within the juvenile proceeding violated her due process rights regarding the termination proceedings. Indeed, Mother's admission of neglect in the juvenile proceeding did not relieve the State from proving by clear and convincing evidence that Mother's parental rights should be terminated. To the contrary, the State could not simply utilize Mother's admission of neglect in the juvenile proceeding but was required to show at trial that Mother neglected MN. This court also notes that Mother was represented by counsel and afforded all procedural safeguards throughout the course of trial in the termination proceedings. Although Mother relies heavily upon the holding in *In re A.P.*, 734 N.E.2d 1107 (Ind.App.2000), as authority for her argument, we do not find that case to be applicable. In *A.P.*, the court found numerous and substantial errors which effectively denied the parent fundamental due process. Substantial procedural irregularities amounting to a denial of due process simply did not occur in this instance. The record does not reflect that Mother was prejudiced or injured by the failure to appoint her counsel at the initial juvenile proceeding. Any error to appoint Mother counsel at the initial juvenile proceedings hearing must therefore be characterized as harmless.

### Evidentiary Issues

[¶ 38] Finally, Mother contends that the district court erred when it admitted laboratory tests showing that she tested positive to the use of drugs without establishing sufficient authenticity or chain of custody regarding those results. The State points out that Mother admitted that she had positive drug screens every week for approximately ten months and asserts that Mother is again unable to show how the court's evidentiary ruling prejudiced her. The State also argues that the test results were properly admitted for the limited purpose of showing what information was available to the State at the time. Furthermore, the State argues that the admission of this evidence is harmless as it was not the primary reason for the termination of parental rights, but rather many reasons are contained within the record which substantiate the district court's ruling.

[¶ 39] Review of the record indicates that the district court admitted the drug test results for only a limited purpose and that Mother eventually admitted to her numerous positive drug screens. Furthermore, as indicated above, the district court's conclusion that Mother's parental rights to MN should be terminated was based on a large body of evidence presented to it over a five-day trial that showed that Mother had neglected MN and was unable to provide MN with basic health and safety within the prescribed statutory guidelines. Nothing in the record indicates that the district court based its decision to terminate Mother's parental rights solely on the results of the drug tests at issue. Accordingly, we hold the limited admission of the drug test results amounts to harmless error.

*CONCLUSION*

[¶ 40]   Upon our careful review of the record, we hold that the judgment entered by the district court terminating the parental rights of Mother to MN is affirmed.