# IN THE SUPREME COURT, STATE OF WYOMING

## 2022 WY 29

**OCTOBER TERM, A.D. 2021**

**February 28, 2022**

IN THE INTEREST OF: MA, KA and GA,
minor children,

JR,

Appellant
(Respondent),

v.

THE STATE OF WYOMING,

Appellee
(Petitioner).

S-21-0151

*Appeal from the District Court of Weston County*
*The Honorable John R. Perry, Judge*

*Representing Appellant:*
   DaNece Day of Day Law, LLC Gillette, Wyoming.

*Representing Appellee:*
   Bridget L. Hill, Wyoming Attorney General; Misha Westby, Deputy Attorney General; Allison E. Connell, Assistant Attorney General. Argument by Ms. Connell.

*Guardian ad Litem:*
   Joseph R. Belcher, Director; Kim Skoutary Johnson, Wyoming Office of the Guardian ad Litem. Appearance by Ms. Tamara Candelaria.

*Before FOX, C.J., and DAVIS\*, KAUTZ, BOOMGAARDEN, and GRAY, JJ.*

*\*Justice Davis retired from judicial office effective January 16, 2022, and, pursuant to Article 5, § 5 of the Wyoming Constitution and Wyo. Stat. Ann. § 5-1-106(f) (LexisNexis 2021), he was reassigned to act on this matter on January 18, 2022.*

**NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**BOOMGAARDEN, Justice.**

[¶1]    JR (Mother), who lives out of state and has not been adjudicated abusive or neglectful, appeals the juvenile court's order changing the permanency plan for her and her three children from family reunification to termination of parental rights and adoption. Mother asserts the court abused its discretion when it determined the Wyoming Department of Family Services had made reasonable efforts to reunify her with the children. Because the record, viewed in the light most favorable to the State, reflects that the Department failed to prove by a preponderance of the evidence that it made reasonable efforts, we reverse the court's order changing the permanency plan and remand with instructions to the court.

## *ISSUE*

[¶2]    The issue is:[1]

> Did the juvenile court abuse its discretion when it determined the Department had made reasonable efforts to reunify Mother with the children?

## *FACTS*

### Background

[¶3]    Mother shares three children—MA,[2] KA, and GA—with MA (Father). The family had primarily lived in Upton, Wyoming, but, due to Father's mental illness and domestic abuse, Mother and the children moved back and forth between Upton and Sturgis, South Dakota in the years leading up to these proceedings. Just prior to the proceedings, Mother was living in South Dakota and the children were in Upton with Father.[3]

---

[1] Mother also asserts the juvenile court violated her due process rights when it failed to consider her as a placement for the children, and when it failed to hold review hearings every six months as required by law. Because our reasonable efforts determination alone warrants reversal, we do not consider Mother's due process argument.

[2] The guardian ad litem (GAL) notes that MA has since turned 18 and should be dismissed from the neglect action because there has been no request or order to extend services beyond his 18th birthday. *See* Wyo. Stat. Ann. § 14-3-431(b) (LexisNexis 2021) ("Unless sooner terminated by court order, all orders issued under this act shall terminate with respect to a child adjudicated neglected, when he reaches eighteen (18) years of age unless the court has ordered care or services to continue beyond that time.").

[3] Mother and Father never married. Mother had tried to leave Father several times. At one point, they separated for a year. The children lived with Mother and completed a full year of school in South Dakota before Mother and Father tried to reconcile. The last time Mother took the children to South Dakota, Father showed up at a community center, took the children back to Upton, and denied Mother visitation for some time after. When Father finally allowed Mother to visit, Mother was only in Upton for a day or two when the events that triggered this case occurred.

1

[¶4]    Mother was visiting the children at Father's home in February 2019, when Father got angry because his mother (DA) would not give him beer money.  Despite frigid temperatures, Father turned off the electricity in the home, sent MA to get money from DA, and threatened to keep the electricity off until he returned.  DA's friend contacted law enforcement, who investigated the report and took the children into protective custody on February 5, 2019.

**Proceedings**

[¶5]    On February 7, the State filed a neglect petition against Mother and Father and the court held an initial and shelter care hearing.  In addition to the events described above, the petition alleged:

> [MA] was hit by [F]ather and bruised on left arm; when angry, [Father] also pours beer onto one of the [children's] bed; [the children] report feeling unsafe at home with parents; [Father's] behavior is part of a pattern related to some apparent mental-illness, which is a threat to [the children] and to himself[.]

Mother and Father each denied the neglect allegations, and Father expressed a desire to give up custody of the children to Mother.  The GAL, appointed to represent the children, recommended they be placed with Father's parents "for the time being."  Though Mother wanted the children to go home with her to South Dakota, she reluctantly agreed to the placement.  The court expressed hesitation to let Mother take the children only because she lived out of state and it wanted "a little more information."  The court placed the children in the legal custody of the Department, and in foster care with Father's parents.  It also ordered that a multidisciplinary team (MDT) be appointed.

[¶6]    Under Wyo. Stat. Ann. § 14-3-426(b), the court was required to hold an adjudicatory hearing within 60 days of the shelter care hearing, and under no circumstances more than 90 days after the filing of the petition.  In early April, the State requested to go beyond the 60-day window, because the parties were "working together to try to negotiate a stipulation as to adjudication[.]"  Then, on June 27, the court granted the State's request to amend the neglect petition and treat it as newly filed.  The new petition incorporated the original allegations, and provided that Mother "shall no longer be a target of the [p]etition, but shall remain a party as the biological mother of the allegedly neglected children."  The court then held another initial and shelter care hearing, this time on the new petition, and continued the children's placement with Father's parents.

2

[¶7]   On September 30, the court accepted the parties' stipulated Rule 7 agreement and finally held the adjudicatory hearing.[4]   As per the stipulation, the court adjudicated the children "neglected" as defined by Wyo. Stat. Ann. § 14-3-402(a)(xii)(A) and § 14-3-202(a)(vii) in that "[F]ather has failed or refused to provide adequate care necessary for [their] well-being[.]"   The court ordered the Department's caseworker to provide a predisposition report.  Its order also stated, in relevant part, that Mother and Father shall: cooperate with the Department and the GAL, comply with their case plans, maintain telephone service or the equivalent, participate in MDT meetings, have visitation with the children, obtain substance abuse evaluations, attend counseling, maintain clean and suitable homes, and submit to random searches and drug testing at the Department's request.

[¶8]   The caseworker filed her predisposition report on November 25, 2019.  She noted that she could not reach Mother "for purposes of completing this report."  The report identified concerns about the children being neglected if Mother did not address her "stability and substance abuse issues" and recommended that Mother complete a substance abuse evaluation to determine necessary treatment.[5]   It listed the permanency plan as reunification with concurrent planning for adoption or guardianship with Father's parents.

[¶9]   The court held a disposition hearing on the heels of the first MDT meeting that same month.  Following the hearing, the court found that the Department had made reasonable efforts to reunify the children with Mother, and that it was in the children's best interests to continue residing with Father's parents.  The court adopted the MDT's recommendations and, in addition to the requirements imposed on Mother in its adjudication order, it further ordered Mother to complete a parenting class, show consistency with appointments and visitation, obtain a counseling needs assessment, and participate in family counseling if recommended.

### Reunification Efforts

[¶10]  Following the initial and shelter care hearing in February, the Department allowed Mother as much visitation as she could make at Father's parents' house in Upton.  In September, seven months after the children had been taken into custody, the Department provided Mother a case plan with a goal of "family reunification".  By late October, Mother

---

[4] Rule 7 of the Rules of Procedure for Juvenile Courts provides that "[s]ubject to approval by the court, parties may stipulate to any matter, including adjudication and disposition."

[5] The documents supporting the neglect petition reflected that MA said his parents "do drugs."  When asked what type of drugs, he said they do meth in the bathroom.  When asked how he knew they used meth, he said that he once saw Mother smoking it out of a pipe.  MA was unable to articulate how he knew what the drug was other than to say, "I just know."  For purposes of the predisposition report, MA stated he had never seen his parents do drugs, but he once found a "meth pipe" in his mom's car.  The caseworker testified at the permanency hearing that her concern about Mother's drug use was based on information from previous times she had worked with the family.

had submitted to two random urinalysis tests, and one had come back positive for methamphetamine.

[¶11] In November, after Mother expressed to the caseworker that visits at Father's parents' house were uncomfortable given her history of abuse by Father, her visitation changed to supervised visits every Friday at noon at the Department's office in Sundance, Wyoming. Mother was required to travel to Wyoming and submit to urinalysis tests prior to these visits. As noted above, the MDT had its first meeting that same month, *see supra* ¶ 9, where the caseworker explained that this case was "a weird situation; the kids have been in custody since February and we need to move forward from here."

[¶12] The MDT met again in February 2020. Mother stated she was attending a parenting class, looking for a counselor, and had not yet scheduled a substance abuse evaluation. She complained to the MDT that she was not receiving any information on the children and said she wanted to know everything. The caseworker expressed concern that Mother had only made it to two Friday visits with the children since they began in November—she noted that not all of the missed visits were Mother's fault but encouraged Mother to make "it a priority to make it to visits." Mother had provided at least one more urinalysis test, which came back clean. The MDT set a deadline for Mother to complete a counseling needs assessment and a substance abuse evaluation by February 29. On February 13, the caseworker emailed Mother a list of providers in Mother's area.

[¶13] The COVID-19 pandemic arose in March. Due to restrictions on interstate travel, Mother could not have in-person visits for two or three months. During that time, Mother's visitation switched to phone calls and video chats.

[¶14] Mother completed a counseling services intake and began counseling at Behavioral Management Systems in April. Her counselor found that she had issues with anxiety, coping skills, mood instability, and domestic violence trauma. Mother was diagnosed with mild depression and PTSD. The counselor recommended that Mother participate in individual therapy. She put together an "action plan" for Mother and referred her to the Artemis House for additional support. When the COVID-19 travel restrictions were lifted sometime in May or June, the caseworker told Mother they could be flexible regarding visitation and "left the ball in [Mother's] court"—no visitation schedule in Wyoming or South Dakota was ever reestablished. Mother continued having calls with the children.

[¶15] At the June MDT meeting, the caseworker stressed that they needed to see Mother's goals met. Specifically, she said Mother needed to get a substance abuse evaluation, finish her parenting class, continue with counseling, show consistency with visitation, and arrange for family counseling. The caseworker also told the team that Mother had not submitted to a urinalysis in several months because the caseworker had not seen her. The GAL and the caseworker strongly encouraged Mother to get family counseling set up in South Dakota to help ease the transition when the children returned to living with her. The

4

caseworker said the Department may be able to help transport the children but she needed to see consistent visitation from Mother. Mother stated that though she still had not seen the children, she had been having regular phone and video contact with them. She shared that she was in counseling and was working on getting the children set up for counseling. She had one more session left in her parenting class and had a substance abuse evaluation scheduled. Mother asked whether the children were in counseling and when the caseworker replied that they were, Mother expressed frustration again that no one shared information with her regarding the children.

[¶16] Mother completed her substance abuse evaluation in July. She told the evaluator that she had not consumed alcohol in over five years and denied using any drugs. The evaluator had "[n]o recommendations" because Mother "did not meet [the] criteria for alcohol or drug use disorder."

[¶17] At the August MDT meeting, Mother reported she was still attending counseling and had completed her substance abuse evaluation. The caseworker confirmed she had received the evaluation, but said she was unhappy with it because the caseworker was not able to provide the evaluator with collateral information regarding the case. Mother had still not had any in-person visits with the children, but said she spoke with them almost daily. She claimed visitation was hard to arrange due to everyone's schedules. The MDT expressed concern that Mother had still not arranged for family counseling, and Mother responded she was waiting on insurance paperwork to see if her South Dakota provider would accept the children's Wyoming Medicaid. In the meantime, Mother felt that they could begin counseling in Wyoming.

[¶18] DA shared her belief that Mother was not speaking with the children as often as she claimed. DA also mentioned that MA was having some medical issues and Mother asked why she was not notified about this. Mother again expressed frustration that no one cared to keep her updated on the children. DA admitted that she had stopped trying to communicate with Mother about six months into the case. Father shared that he had been visiting the children several times a week at his parent's house. When Mother expressed she felt that was unfair, the caseworker responded that Mother "chose to move away."

[¶19] The county attorney expressed concern that Mother seemed to be "putting the cart before the horse" in terms of reunifying with the children. Mother responded that she had done everything that was asked of her and she did not know what else she could do. The county attorney replied that her concern was more about how long it took Mother to accomplish tasks. Mother shared that she was recently diagnosed with PTSD, and she recognized that that had slowed down the process but stated she would do anything to reunify with the children.

[¶20] At the close of this meeting, the team was split as to whether to change the permanency plan to adoption. The caseworker and the GAL recommended the change with

5

a concurrent plan of reunification so that they could continue to "work for family reunification[.]" Mother, Father, and their attorneys did not agree with the change. The county attorney was "on the fence" and requested an evidentiary permanency hearing.

[¶21] Mother stopped attending counseling in September. According to her discharge report, she "left against professional advice" and her progress was "poor." Mother missed the November 2020 and January 2021 MDT meetings. At the November meeting, the caseworker shared that Mother had arranged but then missed and/or canceled two family counseling appointments in Wyoming. At that point, Mother had not seen the children in person since November 2019. By January, the caseworker had only heard from Mother once since the November meeting. At the close of both meetings, the caseworker, the GAL, and the county attorney supported a permanency plan of adoption and recommended that the Department be relieved from making further reunification efforts.

### Permanency Hearing

[¶22] The juvenile court held a permanency hearing on January 13, 2021.[6] The court took "judicial notice of the juvenile file and all the documents contained therein" at the start of the hearing. The children testified first. GA and KA expressed a desire to live with Father's parents, and GA felt that Mother did not make an effort to see them. MA testified he thought it would be best if they could live with Mother, but he wished she would try harder to reunify with them. Mother and the caseworker each testified at length. We discuss their testimony in detail as relevant to our discussion.

[¶23] At the close of the hearing, Mother argued that the Department failed to prove it had made reasonable efforts to reunify her with the children. The Department argued that Mother failed to follow through with her requirements, and it relied heavily on the fact that Mother had not seen the children in person in over a year. The GAL agreed with the Department, arguing that Mother's biggest issue was "inconsistency." The court ruled from the bench that a change in the permanency plan was warranted, but reserved ruling on whether it should be a concurrent plan that required the Department to continue to make reasonable efforts toward reunification.

[¶24] The court's order then found that the Department had made reasonable efforts and no additional efforts were required. The court concluded it was in the children's best interests to change the permanency plan "from reunification to termination of parental rights for both parents and adoption." Mother appealed.

---

[6] The county attorney requested the permanency hearing in August 2020. The court set the hearing for September 18, but, in response to two separate requests from Mother, continued it to November 25, 2020 and then to January 13, 2021.

6

## STANDARD OF REVIEW

[¶25]  To change a permanency plan "from family reunification to adoption, a juvenile court must find that [the Department] made reasonable efforts to achieve reunification without success and that reunification is no longer in the children's best interest."  *Interest of RR*, 2021 WY 85, ¶ 97, 492 P.3d 246, 270 (Wyo. 2021) (citing *Interest of SW*, 2021 WY 81, ¶ 17, 491 P.3d 264, 269 (Wyo. 2021)).  We review the court's reasonable efforts determination for abuse of discretion.  *Id.* ¶ 98, 492 P.3d at 270–71 (citing *Interest of JW*, 2018 WY 22, ¶ 20, 411 P.3d 422, 426 (Wyo. 2018)).

[¶26]  The Department had the burden at the permanency hearing to prove that it made reasonable reunification efforts.  *See Interest of AM*, 2021 WY 119, ¶ 15, 497 P.3d 914, 920 (Wyo. 2021) (the Department must "demonstrate to the juvenile court that it made reasonable efforts to reunify the family but was unsuccessful" (quoting *Interest of VS*, 2018 WY 119, ¶ 38, 429 P.3d 14, 25 (Wyo. 2018)); *JW*, ¶ 19, 411 P.3d at 426.  On appeal, we must look at whether the court's determination that the Department met its burden was reasonable and supported by a preponderance of the evidence.  *RR*, ¶ 98, 492 P.3d at 270–71 (citing *JW*, ¶ 20, 411 P.3d at 426).  "A 'preponderance of the evidence' is defined as 'proof which leads the trier of fact to find that the existence of the contested fact is more probable than its non-existence.'"  *J.J.F. v. State*, 2006 WY 41, ¶ 9, 132 P.3d 170, 174 (Wyo. 2006) (citation omitted).

[¶27]

> In analyzing the sufficiency of [the] evidence, we defer to the juvenile court's judgment, examining all evidence in the light most favorable to the State and resolving all evidentiary conflicts in its favor.  We assume all of its evidence is true and disregard any contrary proof adduced by the parent challenging the juvenile court's decision.

*RR*, ¶ 98, 492 P.3d at 271 (quoting *VS*, ¶ 38, 429 P.3d at 25).  We cannot affirm a court's ruling changing the permanency plan when the record, reviewed under this standard, reflects that the Department failed its burden.

## DISCUSSION

[¶28]  "The liberty of a parent to the care, custody and control of [her] child is a fundamental right that resides first in the parent."  Wyo. Stat. Ann. § 14-2-206(a) (LexisNexis 2021).  "[A] parent's right to raise his or her children is an essential and basic civil right."  *Interest of FM*, 2007 WY 128, ¶ 9, 163 P.3d 844, 847 (Wyo. 2007) (citing *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212–13, 31 L.Ed.2d 551 (1972)).  This right is implicated in decisions leading up to the termination of parental rights.  *See*

*Interest of: AA*, 2021 WY 18, ¶ 12, 479 P.3d 1252, 1257 (Wyo. 2021) (halting reunification efforts "affects a parent's substantial rights").

[¶29] In abuse and neglect cases, the Department is statutorily required to "make reasonable efforts to 'preserve and reunify the family[.]'" *SW*, ¶ 19, 491 P.3d at 270 (quoting Wyo. Stat. Ann. § 14-3-440(a)). That means the Department must make reasonable efforts to "eliminate the need to remove the child[ren] from the home, or to make it possible for the child[ren] to safely return" home. *AM*, ¶ 15, 497 P.3d at 920 (citing Wyo. Stat. Ann. § 14-3-440(a)). To be considered reasonable, the Department's efforts must "have been accessible, available and appropriate." *SW*, ¶ 20, 491 P.3d at 270 (quoting Wyo. Stat. Ann. § 14-3-440(e)).

[¶30] The Department's efforts must also be tailored to the distinct circumstances of each case. *See id.* ("[T]he Department is obligated to make reasonable efforts suitable to the unique situation of the family involved." (quoting *Matter of BAD*, 2019 WY 83, ¶ 37, 446 P.3d 222, 232 (Wyo. 2019) (J. Fox, concurring))); *see also In re HP*, 2004 WY 82, ¶ 26, 93 P.3d 982, 990 (Wyo. 2004) (discussing a parent's tailored case plans); Wyo. Stat. Ann. § 14-3-204(a)(iv) (LexisNexis 2021) (the Department's services must "assist in resolving [the] problems that [led] to or caused the child abuse or neglect"). Thus, to demonstrate that its efforts were reasonable, the Department must make clear the reasons that necessitated the out of home placement in the first place, and then show how its efforts were directed at remedying those reasons. *See also In re M.F.*, 243 Cal.Rptr.3d 510, 518 (Cal. Ct. App. 2019) ("To support a finding that reasonable services were offered or provided to the parent, the record should show that the supervising agency identified the problems leading to the loss of custody [and] offered services designed to remedy those problems[.]" (citations omitted)); *Matter of J.D.R.*, 493 P.3d 567, 571 (Or. Ct. App. 2021) ("[R]easonable efforts are 'efforts that focus on ameliorating the adjudicated bases for jurisdiction, and that give parents a reasonable opportunity to demonstrate their ability to adjust their conduct and become minimally adequate parents.'" (internal quotes and citation omitted); *In re J.M.*, 193 A.3d 773, 783 (D.C. 2018) ("[T]he state's services 'must adequately pertain to the impediment to reunification[.]'" (citation omitted)); *Matter of Welfare of H.K.*, 455 N.W.2d 529, 532 (Minn. Ct. App. 1990) (Minnesota statutes require that reasonable efforts must be made "to correct the conditions that led to the dependency determination.").

[¶31] The juvenile court, pursuant to Wyo. Stat. Ann. § 14-3-431(c)(vi), must conduct review hearings to assess, among other things, whether "progress has been made toward alleviating or mitigating the causes necessitating placement outside the home[.]" The court must also assess the Department's efforts at permanency hearings, and it may order the Department to make additional efforts as needed. Wyo. Stat. Ann. § 14-3-431(d), (k)(ii). Accordingly, the juvenile court must evaluate the Department's efforts on a "case-by-case basis, taking into consideration the totality of the circumstances." 1 Children & the Law:

8

Rights and Obligations § 3:10, Westlaw (database update May 2021); *SW*, ¶ 20, 491 P.3d at 270.

[¶32]   As the caseworker noted at the first MDT meeting in November 2019—nine months after the children had been removed from Father's home—this is a "weird situation[.]"  The Department had made no allegations of abuse or neglect against Mother.  The original neglect petition filed in February against both Mother and Father, contained factual allegations only about Father.  In June, the State removed Mother from the neglect petition altogether.  The juvenile court approved that change at the second initial and shelter care hearing.[7]  In September, the children were adjudicated neglected **by Father**.  Mother no longer lived with Father; she lived in South Dakota.  We acknowledge that the Department had a history with the family in Wyoming, but the Department never articulated the reasons why it needed to remove the children from Mother's South Dakota home.  It would seem to be inherently difficult to tailor reunification efforts, or to review any such efforts, when the reasons for the children's placement away from Mother and her home were never set forth.[8]

[¶33]   We must consider Mother's argument that the Department failed to provide more than a handful of services that were "accessible, available and appropriate" to reunify her with the children in the context of these unusual circumstances.  Having judiciously reviewed the record, we conclude the juvenile court could not reasonably determine that the Department proved, by a preponderance of the evidence, efforts were reasonably tailored, accessible, available, or appropriate to genuinely help Mother achieve the court ordered requirements and case plan objectives apparently deemed necessary to safely return the children to Mother's South Dakota home.  The evidence instead shows the

---

[7] We question the State's practice of filing of an "amended" petition with a request to treat it as newly filed, and thus delay adjudication.  The deadlines set forth in Wyo. Stat. Ann. § 14-3-426, and elsewhere in the Child Protection Act, are intended "to ensure a relatively speedy resolution of child protection matters to reduce the amount of uncertainty in the child's life and prevent an undue infringement on the constitutionally protected parent-child relationship."  *In re DSB*, 2008 WY 15, ¶ 23, 176 P.3d 633, 638 (Wyo. 2008).

[8] The court told Mother at the February hearing:

> The only thing that would give me some pause today with not letting the children go with you today, ma'am, is the fact that you're in South Dakota. We need a little more information.

Is it unclear from the record what information the court needed, and whether or not it was ever provided.

The State asserted in its amended petition that Mother "agreed that the children should remain in their current placement while [the] matter [was] pending."  Because the transcript for the hearing on the amended petition is not included in the record, it is unclear if this is in reference to Mother's reluctant agreement to the placement with Father's parents at the February hearing, *see supra* ¶ 5, or if there was some additional agreement.

Department provided minimal, informational assistance and was inflexible and disengaged from Mother and her unique circumstances.[9]

### **Court Ordered Requirements**

[¶34] The court ordered Mother to obtain a counseling needs assessment, arrange and participate in individual and family counseling as needed, get a substance abuse evaluation, complete a parenting class, and maintain telephone service. The Department's evidence, and the rest of the record—viewed in the light most favorable to the State—shows that all the Department did to assist Mother in completing these tasks was email her a list of assessment and evaluation providers in her area and remind her to complete these tasks at MDT meetings and through a couple phone calls and emails.

[¶35] Because the Department's efforts must "go beyond mere matters of form, . . . so as to include real, genuine help[,]" *BAD*, ¶ 37, 446 P.3d at 232 (J. Fox, concurring) (citation omitted); 1 Children & the Law: Rights and Obligations § 3:10, one list of providers and a handful of reminders cannot be considered tailored, appropriate, or otherwise genuinely helpful. *See In re R.J.F.*, 443 P.3d 387, 398 (Mont. 2019) ("[E]ngaging in reasonable efforts requires more than merely suggesting services to a parent and waiting for the parent to then arrange those services for herself."); *In re James G.*, 943 A.2d 53, 84 (Md. Ct. Spec. App. 2008) ("[T]he Department must do more than simply provide the parents with a list of service providers and then leave the parents to obtain services on their own." (citation omitted)); *cf. Matter of GGMC*, 2020 WY 50, ¶ 32, 460 P.3d 1138, 1148 (Wyo. 2020) (the Department arranged and paid for the father's drug testing and made various referrals to counseling services); *SW*, ¶ 13, 491 P.3d at 268–69 (the Department provided individual mental health counseling, substance abuse counseling, and provided and transported the parents to psychological evaluations.).

[¶36] The Department failed to show that it tailored its efforts to Mother's unique circumstances. Of particular concern is the lack of evidence from the Department that it considered how Mother's mental health affected her ability to comply with the court ordered requirements. The caseworker testified that, in her experience, depression can inhibit a parent from fully taking action to reunify. Though she had been aware of Mother's history of domestic abuse since the beginning of the case, she said she and Mother never discussed it in relation to her case or talked about how it might affect Mother's ability to

---

[9] The State presents this case as one of a parent's failure to cooperate. It argues it provided "the most accessible, available, and appropriate services that it could" given Mother's lack of cooperation. We recognize that if a parent is uncooperative, it may be unreasonable to require the Department to make **further** efforts. *See RR*, ¶ 99, 492 P.3d at 271 (citing *JW*, ¶ 21, 411 P.3d at 426). But a parent's lack of cooperation does not relieve the Department of its responsibility at the outset. Furthermore, the record does not show Mother to have been uncooperative. *Cf. In re SRJ*, 2009 WY 94, ¶¶ 7–9, 212 P.3d 611, 613 (Wyo. 2009); *In re ARC*, 2011 WY 119, ¶¶ 17–22, 258 P.3d 704, 709 (Wyo. 2011); *Interest of RR*, 2021 WY 85, ¶¶ 103–05, 492 P.3d 246, 272 (Wyo. 2021).

meet her case objectives. We understand the caseworker had not been provided the results of Mother's counseling services intake prior to the permanency hearing; however, Mother had shared at the August MDT meeting that she was recently diagnosed with PTSD, which she believed had hindered her ability to meet her requirements. The Department provided no evidence to show that it made any effort to verify or accommodate Mother's PTSD diagnosis.

[¶37] In regard to individual counseling, the Department's evidence showed that Mother, relying on the list of providers from the caseworker, *see supra* ¶ 36, enrolled in and attended counseling, though only for about five months. Similarly, the caseworker testified that she emailed Mother to inform her of a free "Love and Logic" parenting class. At the time of permanency hearing, Mother had either completed or almost completed a different parenting class.

[¶38] As to Mother's substance abuse evaluation, the caseworker testified the evaluation was insufficient because the caseworker was not able to provide the evaluator with collateral information about any substance abuse history. According to the caseworker, the Department usually coordinates with parents to schedule evaluations, but the record nowhere reveals that she ever attempted to coordinate this with Mother. Instead, the MDT notes show that Mother shared at the June meeting that she had an evaluation scheduled for the following week, and the Department did not follow up. The notes further show that the caseworker had received the evaluation, and determined it was unsatisfactory, prior to the August meeting. It is unclear why the caseworker never requested that Mother obtain another evaluation with input from the caseworker prior to the permanency hearing.

[¶39] The Department's evidence further illustrates it was inflexible in assisting Mother in remedying impediments she encountered while trying to achieve her court ordered requirements. The law requires reasonable flexibility on the part of the Department to assist parents in overcoming impediments to their case objectives. *Compare In re MN*, 2003 WY 135, ¶ 20, 78 P.3d 232, 237 (Wyo. 2003) (reasonable efforts found where the Department "on numerous occasions conducted one-on-one discussions with Mother" and tailored its efforts to "account [for] the particular needs of Mother, as more information became available"), *and JW*, ¶ 26, 411 P.3d at 427 (reasonable efforts found where the Department adapted its efforts after the father went to prison to assist him to continue working toward his case objectives), *with FM*, ¶¶ 12–14, 163 P.3d at 848 (reasonable efforts not found where the reunification case plan was never updated, and the Department made no attempts to facilitate contact between Mother and the child once Mother went to jail.).

[¶40] The MDT requested that Mother arrange for family counseling in South Dakota. The caseworker testified at the hearing about Mother's delay and ultimate failure to make those arrangements. On cross-examination, however, the caseworker admitted that she never provided Mother the necessary insurance forms to arrange family counseling for the

children, who were enrolled in Wyoming Medicaid, in South Dakota, though she did provide similar forms to Father's parents to assist them with a surgery MA had in South Dakota. She testified she was not aware that Mother needed help with this, but the MDT notes reflect that Mother communicated this issue at both the June and August meetings.

[¶41]   As to maintaining telephone service, the caseworker testified that sometimes when she called Mother, she learned that Mother had run out of minutes. She admitted, however, that she never discussed the issue with Mother, and never offered assistance to ensure Mother could maintain telephone contact.

### Case Plan Objectives

[¶42]   The Department provided Mother with a basic case plan seven months after it took the children into custody. Its evidence at the hearing, and the rest of the record—viewed in the light most favorable to the State—again shows the Department made minimal or no effort to assist Mother in meeting her two objectives:

- Visitation
  - Mother "will work [with DA] on setting up visits"
  - Mother "will make it to the visits"
  - Mother "will [submit to urinalysis] before visits"

- Safe suitable home
  - "[D]rug free home"
  - "[C]lean home, provide food, place for a[ll] three children to sleep[, and] heat [and] water in the home"
  - "[C]omply [with] home visits [and] random [urinalysis tests]"

[¶43]   As to the Department's efforts to assist Mother with visitation, the caseworker's testimony reflected that the Department offered Mother visitation at Father's parent's house in Upton from February 2019 through October 2019. Then it arranged for scheduled visitation and urinalysis testing once a week at its Sundance office from November 2019 until the COVID-19 pandemic arose in March 2020. While in-person visits were suspended from mid-March until May or June, it allowed Mother video visits and phone calls with the children. From May or June 2020 until the time of the permanency hearing, the caseworker testified she "left the ball in [Mother's] court" regarding visitation after letting her know they could be flexible regarding location.

[¶44]   At the hearing, the Department focused on evidence showing Mother's poor track record for visitation and the fact that Mother had not seen the children in over a year by the time of the permanency hearing. The caseworker testified that Mother made "[v]ery few"

12

visits in Upton, and only two of the scheduled visits occurred in Sundance—most were cancelled by Mother.

[¶45]  But the caseworker also acknowledged, and the MDT notes and case notes confirm, that Mother had told her that Fridays at noon were a bad time for her because she was taking care of her grandmother and her father in South Dakota.  We could find no evidence to show whether or how the Department considered adjusting the schedule to accommodate Mother's obligations, or to verify whether such accommodation was appropriate.  Nor did the Department offer to reschedule any of the missed visits, whether they were cancelled by Mother or for another reason.  The caseworker also testified that Mother requested a December 2020 visit with the children.  The record confirms that Mother requested a weekend in a hotel with the children, but the Department was uncomfortable with her request and the court denied it.  There is no evidence in the record that the Department ever offered Mother a more suitable alternative.

[¶46]  The Department's evidence also shows that it failed to consider or make efforts to address other relevant circumstances, not the least of which was Mother's transportation issues.  The MDT notes show that Mother told the team in February 2020 that she was "working on getting her vehicle up to par so she can make the visits with the kids."  The caseworker's notes confirm that Mother had missed at least two Friday visits due to car troubles.  Yet, the caseworker testified the Department never offered Mother financial support for vehicle repairs because Mother never explained her car troubles to the caseworker.  And furthermore, the record nowhere indicates that the Department ever offered Mother transportation services to attend scheduled visits or to arrange for the children to visit her in South Dakota.  *Cf. RR*, ¶ 104, 492 P.3d at 272 (the Department offered FR transportation services); *HP*, ¶¶ 9, 26, 93 P.3d at 986, 990 (the Department offered the mother transportation to visit the children); *MN*, ¶ 24, 78 P.3d at 238 (the Department offered the mother transportation from Pinedale to Jackson to visit her child).

[¶47]  According to the Department's evidence, in the almost two years between the children's removal from the home and the permanency hearing, it offered Mother open-ended visitation for about nine months; scheduled supervised visitation, and urinalysis testing, for less than five months; and allowed Mother virtual visitation when the COVID-19 pandemic arose.  Offering, scheduling, or allowing a parent visitation with her children is not enough.  Nor is leaving "the ball in [Mother's] court" for the six or seven months prior to the permanency hearing.  The Department must present evidence that it made efforts to genuinely help Mother achieve regular visitation with her children.  *See R.J.F.*, ¶ 37, 395 Mont. at 472, 443 P.3d at 398 ("[E]ngaging in reasonable efforts requires more than merely suggesting services to a parent and waiting for the parent to then arrange those services for herself."); *BAD*, ¶ 37, 446 P.3d at 232 (J. Fox, concurring) (reasonable efforts must "go beyond mere matters of form," "so as to include real, genuine help" to "improve the circumstances of the parent and the relationship of the parent with the child" (quoting

13

*Matter of Welfare of J.A.*, 377 N.W.2d 69, 73 (Minn. Ct. App. 1985))). We could find no such evidence in the record before us.

[¶48] Last, but certainly not least, the Department presented no evidence that it made any effort whatsoever to assist Mother in meeting her goal of providing a "safe suitable home" for her children in South Dakota. The caseworker testified that she had never observed Mother's home, and she had never put in a request for someone in South Dakota to make a home inspection. We cannot ignore the Department's complete failure to address this important, long-term objective.[10]

[¶49] Even when viewed in the State's favor, the record demonstrates the Department failed its burden to show it provided Mother tailored, accessible, available, or appropriate services, or any "genuine help" to achieve reunification with her children.

[¶50] Mother's right to care for and raise her children is an essential right. *See FM*, ¶ 9, 163 P.3d at 847. The requirement that the Department make reasonable reunification efforts is intended to protect her rights. For the reasons stated above, we conclude the Department failed to carry its burden to prove that reasonable efforts were made in this case, and the juvenile court could not reasonably conclude to the contrary.

[¶51] We also cannot ignore the juvenile court's failure to maintain oversight of this case. Wyo. Stat. Ann. § 14-3-431(c) requires the juvenile court to hold review hearings every six months following a child's removal from the home, during which it must evaluate:

> (i) The health and safety of the child[ren];
> (ii) The continuing necessity for the [children's out of home] placement;
> (iii) The appropriateness of the current placement;

---

[10] This case is factually distinguishable from *In re ARC*, where we concluded the Department had made reasonable efforts even though it had not conducted a home inspection to determine if the mother's house was safe and suitable for children. ¶ 22, 258 P.3d at 709. There, the "caseworker testified that, had Mother complied with the other parts of her family service plan, [the Department] would have inspected her home when it started the reunification process." *Id.* We agreed that was reasonable because "[u]ntil the time when actual family reunification was drawing closer, there was no reason to inspect her home." *Id.* Here, the caseworker provided no such testimony or other rationale for not conducting a home inspection and the record suggests that reunification was expected sooner rather than later—the MDT even encouraged Mother, throughout the case, to arrange family counseling in South Dakota to ease the children's transition. Additionally, in *ARC*, the children were removed from the home because it was not safe and suitable. *Id.* ¶ 6, 258 P.3d at 707. That case began when investigators found the young children home alone with drugs, drug paraphernalia, needles, pill bottles, a large amount of cash, and a stolen firearm. *Id.* ¶¶ 6, 16, 258 P.3d at 707, 708. Here, the children were removed from Father's home, not Mother's, there was no evidence that Mother's house was not safe or suitable for the children, and there was no obvious reason why Mother's case plan contained this specific objective.

14

**(iv) The reasonableness of efforts made to reunify the family and the consistency of those efforts with the case plan**;
(v) The appropriateness of the case plan and the extent of compliance with the case plan including the permanent placement of the child[ren];
(vi) If progress has been made toward alleviating or mitigating the causes necessitating placement outside the home and the extent of that progress; and
(vii) The date the child[ren] [are] expected to be returned to the home or placed for adoption or legal guardianship.

Wyo. Stat. Ann. § 14-3-431(c) (emphasis added).

It must also hold permanency hearings not less than every 12 months after a child is removed from the home, where it again must assess the Department's efforts and may order the Department to make additional efforts. Wyo. Stat. Ann. § 14-3-431(d). It is undisputed that the court should have held a review hearing in August 2019, a review and/or permanency hearing in February 2020, and another review hearing in August 2020. *See* Wyo. Stat. Ann. § 14-3-431. Had the court held the required hearings and asked pertinent questions, problems pertaining to the Department's efforts to reunify the children with Mother could have been sooner identified and addressed.

[¶52] We reverse and remand this matter with instructions to the juvenile court to order the Department to make further reasonable efforts to reunify Mother with the children, and to exercise timely and thorough oversight of all future proceedings.